IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 24, 2006 Session

## KIMBERLY KAY ALLEN, ET AL. v. JOHN DAY, ET AL.
### AND
## GANNETT SATELLITE INFORMATION NETWORK, INC., d/b/a THE TENNESSEAN, ET AL. v. POWERS MANAGEMENT, LLC

Appeal from the Circuit Court for Davidson County
No. 02C-817 and 05C-61     Hamilton V. Gayden, Judge

No. M2005-00989-COA-R3-CV - Filed on August 11, 2006

A privately-held limited liability company appeals the decision of the trial court which found that the company was the functional equivalent of a government agency in its management of a publically-owned facility thus making its documents subject to the Public Records Act. The judgment of the trial court is affirmed in part, reversed in part and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., joined. PATRICIA J. COTTRELL, J., filed a separate concurring opinion.

L. Webb Campbell, II, Phillip F. Cramer, Winston N. Harless, Lisa R. Cole and Deborah Smith, Nashville, Tennessee, for the appellant, Powers Management, LLC.

Alfred H. Knight and Alan D. Johnson, Nashville, Tennessee, for the appellees, Gannett Satellite Information Network, Inc., d/b/a *The Tennessean* and Sheila Burke.

## OPINION

### I. Factual Background

In 2002, fourteen former Nashville Kats cheerleaders sued John Day ("Mr. Day") and James Corn ("Mr. Corn") for their alleged secret videotaping of the cheerleaders in their dressing room. The cheerleaders also sued Mr. Day and Mr. Corn's employers, the Nashville Hockey Club d/b/a the Nashville Predators ("the Predators") and Powers Management, Inc. ("Powers"), a privately-held limited liability company that provides management services to run the day-to-day operations of the Gaylord Entertainment Center ("the Arena") in Nashville, Tennessee. Powers and the Predators

successfully moved for summary judgment on all claims except for the cause of action related to the negligent supervision of Mr. Day and Mr. Corn.

Due to the trial court's concern over the detrimental effect the case may have on the city of Nashville and Plaintiffs, the court entered an order on December 3, 2004, directing the parties to engage in court-sanctioned confidential mediation, pursuant to Tennessee Supreme Court Rule 31, in an attempt to encourage private settlement. The mediation ultimately culminated in a settlement agreement. The contents of the agreement included express language that all parties maintain the confidentiality of the terms of the agreement.

On December 13, 2004, the court entered an order of compromise and dismissal. However, the parties never filed the agreement with the court nor presented it to the court for review or approval. The order provided:

> It appearing to the Court, as evidenced by the signatures of the respective counsel for the parties appearing below, that as a result of the mediation ordered by this Honorable Court pursuant to Tennessee Supreme Court Rule 31, the Plaintiffs and all Defendants have agreed to compromise and settle all matters in controversy in this case, and that the claims of Plaintiffs against Defendants are to be dismissed with prejudice and that Defendants are intended to be discharged from any further liability to Plaintiffs, including all subrogation liens, medical liens, or other liens of any kind or nature, as well as other bills or costs; and that with the exception of the subject matter of the December 5, 2004 press release issued by defendants Powers Management, LLC and The Nashville Hockey Club, Limited Liability Partnership, the terms of the settlement agreement are to remain confidential as between the parties and their respective counsel; it is accordingly,
> **ORDERED, ADJUDGED, and DECREED** that Defendants are dismissed with prejudice and are discharged from any further liability to the Plaintiffs, including all subrogation liens, or other liens of any kind or nature, as well as other bills or costs; and that with the exception of the subject matter of the December 5, 2004 press release issued by defendants Powers Management, LLC and The Nashville Hockey Club, Limited Partnership, the terms of the settlement agreement are to remain confidential as between the parties, with all the parties to bear their own discretionary costs, and court costs taxed to Defendants; and it is further
> **ORDERED, ADJUDGED, and DECREED** that any party may petition this Court by or before July 5, 2005 to set aside this Order if any of the parties to this settlement agreement fail to honor the obligations under the agreement.

On December 6, 2004, Gannett Satellite Information Network, Inc. d/b/a/ the Tennessean ("Gannett") attempted to uncover the contents of the settlement agreement by having its attorney, Alan D. Johnson ("Mr. Johnson"), write a letter to Powers' attorney, Chris Whitson ("Mr. Whitson"), requesting a copy of the agreement. Mr. Johnson asserted that the settlement agreement was a public record since Powers operated the Arena for the Sports Authority of the Metropolitan

Government of Nashville ("the Sports Authority") and in so doing, Powers was the functional equivalent of a government agency. Because the agreement was a public record, Mr. Johnson argued that public access to the agreement was required by the Public Records Act.

Mr. Whitson responded to the letter on December 9, 2004, denying Gannett access to the agreement. Mr. Whitson asserted that under the operating agreement between Powers and the Sports Authority, Powers was not the functional equivalent of a government agency and thus public access to the settlement agreement was not required by the Public Records Act. During this time period, Sheila Burke ("Ms. Burke"), a reporter for the Tennessean, also attempted to gain access to the agreement by initiating direct contact with the trial judge of the civil case in the courthouse hallway.

On December 16, 2004, based partially on Ms. Burke's request, the trial court issued an order, *sua sponte*, stating that the court intended to conduct a public hearing to determine if the settlement agreement should be publically disclosed. The same day, Gannett and Ms. Burke filed a joint petition under the Public Records Act against Powers in Davidson County Chancery Court, however, it was agreed that the petition should be transferred to the Davidson County Circuit Court to be consolidated and heard by interchange.

On March 4, 2005, the trial court conducted a hearing and granted Gannett and Ms. Burke's petition. The court found that (1) Ms. Burke had standing to bring the petition; (2) Powers was the functional equivalent of a government agency and therefore subject to the Public Records Act; and (3) Rule 31 of the Tennessee Supreme Court Rules did not exempt the settlement agreement from disclosure. Based on the court's discretionary power and proposed Rule 1A of the Tennessee Rules of Civil Procedure, the court ordered that the settlement agreement be publicly disclosed by filing the agreement in the court clerk's office. Powers filed a timely appeal.

On appeal, Powers claims that the trial court erred in determining that (1) either Ms. Burke or Gannett had standing to bring the petition against Powers; (2) Powers had the burden of showing that it was not the functional equivalent of government agency; (3) Powers was the functional equivalent of a government agency and as such, the settlement agreement entered into on December 5, 2004, was subject to the Public Records Act; (4) the settlement agreement arising pursuant to Rule 31 mediation was not exempt from disclosure under the Public Records Act; and (5) the court had discretionary power or authority under proposed Rule 1A of the Tennessee Rules of Civil Procedure to order Powers to file the settlement agreement with the court.

The determination of whether the Tennessee Public Records Act applies to Powers' December 5, 2004, settlement agreement is a question of law. *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67, 74 (Tenn.2002). The Court reviews questions of law *de novo* with no presumption of correctness accorded to the trial court's findings below. *Cherokee*, 87 S.W.3d at 74.

II. Subject Matter Jurisdiction

"In order to adjudicate a claim, a court must possess both subject matter and personal jurisdiction." *Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn.1994). "The lack of subject matter jurisdiction is so fundamental that it requires dismissal whenever it is raised and demonstrated. See Tenn.R.Civ.P. 12.08. Thus, when an appellate court determines that a trial court lacked subject matter jurisdiction, it must vacate the judgment and dismiss the case without reaching the merits of the appeal." *Dishmon v. Shelby State Cmty. College*, 15 S.W.3d 477, 480 (Tenn.Ct.App.1999).

Neither the Tennessee Constitution nor the United States Constitution grant subject matter jurisdiction to the courts of this State to adjudicate claims which seek access to records in the possession of either a public or private entity. *Abernathy v. Whitley*, 838 S.W.2d 211, 214 (Tenn.Ct.App.1992). However, the Tennessee legislature has bestowed upon Tennessee courts limited subject matter jurisdiction to adjudicate claims arising under the Public Records Act, where the petitioner seeks access to records in the possession of a government agency. *Abernathy*, 838 S.W.2d at 214. The Public Records Act limits the jurisdiction of the court in two ways. First, pursuant to Tennessee Code Annotated section 10-7-505(a), the petitioner requesting access to the records must be a "citizen of Tennessee." Next, the Act requires that the citizen wishing to avail himself of the courts' subject matter jurisdiction first "request the right of personal inspection of any state, county or municipal record as provided in § 10-7-503" to an "official" or a "designee of [an] official," Tenn.Code Ann. § 10-7-505(a), "during normal business hours." Tenn.Code Ann. § 10-7-503(a).

Powers initially contends that neither Gannett nor Ms. Burke fulfilled the statutory prerequisites stated above so as to provide the trial court with subject matter jurisdiction to adjudicate their petition. Gannett has conceded that it is not a "citizen of Tennessee" within the meaning of the statute, however, Gannett asserts that its employee, Ms. Burke, met the statutory preconditions and thus, the trial court properly exercised subject matter jurisdiction over the petition.

Ms. Burke admittedly did not personally appear during Powers' normal business hours and request a copy of the settlement agreement from Powers' official records custodian. Gannett asserts however, that this failure was not fatal to the acquisition of subject matter jurisdiction. Ms. Burke's affidavit filed on March 2, 2005, revealed that she inquired about the contents of the settlement agreement but that Powers' spokesperson denied access to the record, stating that the agreement was confidential. Ms. Burke's affidavit stated:

1.  My name is Sheila Burke and I am a reporter for *The Tennessean*. I was the reporter who covered the story about the lawsuit between Powers Management, Inc, and others, and the Nashville Kats Cheerleaders that appeared in *The Tennessean* on December 6, 2004.
2.  In the course of preparing the story, I interviewed Mr. Gerry Helper, spokesperson for Powers. I asked about the terms of the settlement, and Mr. Helpers told me that the settlement agreement was confidential.

3. Based upon Mr. Helper's statement, it was clear to me that I would not be granted access to the settlement agreement, and further inquiry into the matter would be futile.

Gannett contends that this request directed to Powers' spokesperson was sufficient to meet the requirements of subject matter jurisdiction.

In *Waller v. Bryan*, 16 S.W.3d 770, 773 (Tenn.Ct.App.1999), the court addressed whether a prisoner's inability to present himself in person to inspect and request copies of documents prohibited him from obtaining those copies if he was otherwise entitled to receive them under the Public Records Act. The court held that it was not necessary for the prisoner to personally appear if the requested documents were sufficiently identified. *Waller*, 16 S.W.3d at 774.

> While Appellees do not have an obligation to review and search their records pursuant to a Public Records Act request, they do have the clear obligation to produce those records for inspection, unless otherwise provided by state law, and to provide a copy or copies of any such record requested by such citizen, upon the payment of a reasonable charge or fee therefor. *See Tennessean v. Electric Power Board of Nashville,* 979 S.W.2d 297, 303 (Tenn.1998). If the citizen requesting inspection and copying of the documents can sufficiently identify those documents so that Appellees know which documents to copy, a requirement that the citizen must appear in person to request a copy of those documents would place form over substance and not be consistent with the clear intent of the Legislature. The adoption of the Appellees' position would mean that any citizen who was unable to personally appear before the records custodian would be unable to obtain copies of the documents pursuant to the Public Records Act. This restriction would prohibit all Tennessee citizens who are unable, because of health reasons or other physical limitations, to appear before the records custodian from obtaining copies of public documents pursuant to the Public Records Act. Such a result is not consistent with the clear intent of the Legislature, and this Court will not interpret this statute in such a way as to prohibit those citizens, or those citizens incarcerated, from the rights provided by the Public Records Act. Appellees can fix a charge or fee per copy so as to recover the actual cost of producing and delivering the copies. *Id.*

> If a citizen can sufficiently identify the documents which he wishes to obtain copies of so as to enable the custodian of the records to know which documents are to be copied, the citizen's personal presence before the record custodian is not required. However, the records custodian is not required under the Public Records Act to make the inspection for the citizen requesting the documents. The citizen, to be able to obtain copies of those documents without making a personal inspection, must sufficiently identify those documents so that the records custodian can produce and copy those documents without the requirement of a search by the records

custodian. The records custodian can require a charge or fee per copy that will cover both the costs of producing the copies and delivering the copies. It is the opinion of this Court that such was the intent of the Legislature.

*Waller*, 16 S.W.3d at 773-74.

As the court eluded to in *Waller*, the purpose of the personal appearance requirement is to prevent wasted governmental time and money caused by the endless search through voluminous records for a document which was insufficiently identified by the petitioner. Powers does not argue that Ms. Burke's request was insufficiently described nor does it argue that it lacked notice of Ms. Burke's request due to her failure to personally appear before Powers' official records custodian. Powers simply contends that Ms. Burke did not comply with the literal language of the statute and therefore she should be precluded from contesting the denial of access to the settlement agreement.

To strictly construe the subject matter jurisdictional requirements, as Powers suggests, would be to defeat the clear language of the Act which states that the Act is to be "broadly construed so as to give the fullest possible public access to public records." Tenn.Code Ann. § 10-7-505(d). Clearly in this case the denial of access to the agreement by Powers' spokesperson constitutes a denial by an "official" or "designee of [a] official" within the meaning of Tennessee Code Annotated section 10-7-505(a). Furthermore, it is undisputed that Ms. Burke sufficiently identified the requested document. We therefore find that Ms. Burke's request was sufficient to meet the statutory subject matter jurisdictional requirements and that the trial court properly exercised jurisdiction.

## III. Burden of Proof

Powers next argues that the trial court erred in placing the burden of proof on Powers to establish that it is not the functional equivalent of a governmental entity. The trial court stated in its memorandum decision entered on March 24, 2005:

> Powers argues that if it is truly considered the functional equivalent of a governmental agency then the taxpayers would be required to fund the settlement, not Powers Management. It is the court's opinion that this factor alone is not enough to overcome *the burden on the defendant* to show by a preponderance of the evidence that the final settlement agreement should not be made public. <u>See Memphis Publishing Co. v. Cherokee Children & Family</u>, 87 S.W.3d 67 (Tenn.2002) (emphasis added).

Instead, Powers asserts that the trial court should have started with the presumption that Powers was not subject to the Act and placed the burden on Gannett to prove otherwise.

Tennessee Code Annotated section 10-7-505(c) provides that "[t]he burden of proof for justification of nondisclosure of records sought shall be upon the official and/or designee of the official of those records and the justification for the nondisclosure must be shown by a preponderance of the evidence." The alleged basis of Powers' nondisclosure of the settlement agreement was that (1) Powers was not the functional equivalent of a governmental agency; and (2) the agreement was exempt from disclosure under Tennessee Supreme Court Rule 31. Therefore, assuming that Powers is indeed a "functional equivalent," it was incumbent upon Powers to prove either of those bases by a preponderance of the evidence.

The trial court's memorandum decision does not support the proposition that the trial court misplaced the initial burden, which laid with the petitioner, of showing that Powers was the functional equivalent of a governmental agency. But rather, the court restates Powers' burden as provided under Tennessee Code Annotated section 10-7-505(c). Gannett even admitted its burden during the hearing on March 4, 2005, stating:

> For purposes of argument, I might concede that we have a threshold argument to make that they are the functional equivalent. We think we've met that. We think the contract makes that clear.

## IV. Functional Equivalency Test

The Public Records Act's application has been limited to public records, Tennessee Code Annotated section 10-7-503(a), which are statutorily defined as "all documents ... made or received pursuant to law or ordinance in connection with the transaction of official business by any governmental agency." Tenn.Code Ann. § 10-7-301(6). Tennessee Code Annotated section 10-7-504(a)(16)(i) defines a governmental agency as "the state of Tennessee and any county, municipality, city, or other political subdivision of the state of Tennessee." Therefore, "records in the hands of private parties are beyond the reach of the public record statutes." *Swift v. Campbell*, 159 S.W.3d 565, 572 (Tenn.Ct.App.2004).

However, the Tennessee Supreme Court determined in *Cherokee*, 87 S.W.2d at 78-79, that private entities may be subject to the Act if the private entity's "relationship with the government is so extensive that the entity serves as the functional equivalent of a government agency." The Court reasoned that "private entities that perform public services on behalf of a government often do so as independent contractors. Nonetheless, the public's fundamental right to scrutinize the performance of public services and the expenditure of public funds should not be subverted by government or by private entity merely because public duties have been delegated to an independent contractor." *Cherokee*, 87 S.W.3d at 78.

The Court went on to state that the cornerstone of determining whether a private entity operates as the functional equivalent of a governmental agency and therefore subject to the Act is "whether and to what extent the entity performs a governmental or public function." *Cherokee*, 87 S.W.3d at 79. The Court also listed additional non-exhaustive factors which are relevant to the

determination including: "(1) the level of government funding of the entity; (2) the extent of government involvement with, regulation of, or control over the entity; and (3) whether the entity was created by an act of the legislature or previously determined by law to be open to public access." *Cherokee*, 87 S.W.3d at 79. The Court cautioned however, that "[a] private business does not open its records to public scrutiny merely by doing business with, or performing services on behalf of, state or municipal government" but instead, the entity must assume "responsibility for providing public functions to such an extent that it becomes the functional equivalent of a governmental agency." *Cherokee*, 87 S.W.3d at 79.

In *Cherokee*, Cherokee Children and Family Services ("Cherokee") entered into an independent contractor relationship with Tennessee Department of Human Services to provide services related to government subsidized child care. In determining that Cherokee was the functional equivalent of a government agency, the Court noted that "most critically" the services which Cherokee performed, providing child care for indigents and supervising child care placements, were "undeniably public in nature." *Cherokee*, 87 S.W.3d at 79. The Court acknowledged that Cherokee was a private corporation not created by legislature, the contract governing the parties' relationship disavowed any agency relationship, and the State incurred no tort liability for Cherokee's actions. *Cherokee*, 87 S.W.3d at 80. However, the Court found that these considerations were outweighed by the fact that Cherokee's charter stated that its purpose was dedicated to public service, it was financed almost exclusively with public funds, and the contract between the parties evidenced that the State exercised significant oversight and control over the entity including the advanced State approval of allowable costs and the authorization of State audits. *Cherokee*, 87 S.W.3d at 79-80.

As we turn to the case at bar, we must balance the factors set out by the Court in *Cherokee*. We note however, as did the Court in *Cherokee*, that "[i]n making this determination, we look to the totality of the circumstances in each given case, and no single factor will be dispositive." *Cherokee*, 87 S.W.3d at 79.

A. Government Function

In 1993, the Sports Authority was legislatively created as a public non-profit corporation pursuant to Tennessee Code Annotated section 7-67-101, *et seq*. The stated purpose of the corporation was "to promote and further develop recreational opportunities in this state, by facilitating and equipping the acquisition, construction, and rehabilitation of sports complexes, stadiums, arena and other recreational facilities, for the holding of professional and amateur athletic events." Tenn.Code Ann. § 7-67-102(a)(1). Tennessee Code Annotated section 7-67-109 expressly grants the Sports Authority the power to:

(5) Operate, maintain, manage, and enter into contracts for the operation, maintenance and management of any project undertaken, and to make rules and regulations with regard to such operation, maintenance and management;

-8-

(7) Lease, rent and contract for the operation of all or any part of any project for sports and recreational facilities, and charge and collect rent for the project and terminate any such lease upon the failure of the lessee to comply with any of the obligations of the lease; and include in or exclude from any such lease provisions that the lessee shall have the option to renew the term of the lease for such period or periods and at such rent as shall be determined by the board of directors;

(9) Fix and collect rates, rentals, fees and charges for the use of any and all of the sports and recreational facilities of the authority;

(10) Contract for the operation of concessions on or in any of the sports and recreational facilities of the authority;

(11) Advertise within or without the state any of the sports and recreational facilities of the authority;

Tenn.Code Ann. § 7-67-109.

Pursuant to these powers, the Sports Authority constructed the Arena, which was completed in 1996.

On June 25, 1997, the Sports Authority entered into an operating and management agreement with Powers whereby Powers "assume[d] responsibility for the day to day operation, management, maintenance, repair, use, advertising, and marketing of ... [the] [A]rena." Gannett contends that Powers' assumption of the Sports Authority's duty to mange a publically-owned facility, constitutes the performance of a governmental function. However, Powers argues that although it manages a public facility for a non-profit corporation owned by the government, Powers performs this government service pursuant to a contract without the authority to govern, regulate or make decisions affecting the government and therefore, it is not a public agency subject to the Act.

In order to determine whether Powers' assumption of the Sports Authority's management duties constitutes the performance of a governmental function, we first must define what is a government function. Government function is not statutorily defined and Tennessee case law provides little guidance. However, in adopting the functional equivalency test, the Tennessee Supreme Court relied heavily upon Connecticut law. *Cherokee*, 87 S.W.3d at 87. ("Numerous other jurisdictions have examined how public records laws should apply in a climate of increased privatization to ensure that public access, and hence governmental accountability, is preserved. One widely-used approach, pioneered by the Connecticut Supreme Court...").

In 2001, the Connecticut legislature expressly defined "governmental function" as applied to Connecticut's Freedom of Information Act, an Act substantively similar to Tennessee's Public Records Act. The statute provides:

(11) "Governmental function" means the administration or management of a program of a public agency, which program has been authorized by law to be administered or managed by a person, where (A) the person receives funding from the public agency for administering or managing the program, (B) the public agency is involved in or regulates to a significant extent such person's administration or management of the program, whether or not such involvement or regulation is direct, pervasive, continuous or day-to-day, and (C) the person participates in the formulation of governmental policies or decisions in connection with the administration or management of the program and such policies or decisions bind the public agency. "Governmental function" shall not include the mere provision of goods or services to a public agency without the delegated responsibility to administer or manage a program of a public agency.

Conn.Gen.Stat.Ann. § 1-200(11).

Applying the factors that the Connecticut legislature found relevant, we believe that Powers performs a governmental function in its management of the Arena. First, the Sports Authority has been statutorily authorized to allocate the management duties of the Arena to another person or entity. Tennessee Code Annotated section 7-67-109(7) provides that the Sports Authority may "lease, rent and contract for the operation of all or any part of any project for sports and recreational facilities."

Next, the funding required to manage the Arena is solely provided by the Sports Authority. Section 7.1 of the operating agreement provides:

> **7.1    Payment of Operating Expenses**. Except as otherwise expressly provided herein, the Sports Authority shall be solely responsible for providing funds to [Powers] necessary to pay costs and expenses reasonably incurred by [Powers] to perform its responsibilities and obligations hereunder (collectively, "Operating Expenses"), including all payments made or liabilities incurred to obtain Operating Revenues, all installments of the Management Fee, wages, salaries, and employee benefits, maintenance and repair costs, utility charges and deposits, reasonable audit fees, legal fees and other professional fees, fees payable to concessionaires or other subcontractors, the cost of refuse removal, cleaning, pest control and janitorial services, sales taxes, use taxes and other taxes or impositions applicable to the operation of the Arena, the costs of building supplies, tools, equipment, premiums for insurance which [Powers] is required to maintain under the terms of this Agreement, expenses incurred for advertising, marketing and public relations, travel, lodging and related out-of-pocket expenses and Arena related entertainment expenses incurred by [Powers] solely for the purpose of increasing Operating Revenues, the cost of necessary office supplies, freight and delivery charges, equipment rents, the cost of utilizing credit and debit facilities, and all damages, losses or expenses

suffered or paid by [Powers] as the result of any and all claims, demands, suits, causes of action, proceedings, judgments and liabilities, including reasonable attorneys fees incurred in litigation or otherwise (including clams related to Intellectual Property), assessed, incurred or sustained by or against any of them including or pursuant to contracts executed by [Powers] in accordance with the authority granted hereunder.

The Sports Authority is also significantly involved in Powers' management of the Arena. The operating agreement states, "[Powers] and the Sports Authority recognize that the Sports Authority has a substantial interest in the manner in which the Arena is operated and maintained and has a responsibility to the public to ensure that the Arena is operated and maintained in a manner consistent with public facilities." This substantial interest is illustrated by the pervasive influence and control the Sports Authority exerts over Powers' management of the Arena. Under the operating agreement, Powers is required to consult with the Sports Authority with respect to the service of alcohol, the designation of smoking areas in the Arena, the rates and charges for events and parking, community events held at the Arena, any material alterations, additions, changes, or improvements to the Arena, the selection of a general manager, the settlement of any claim, the entering into of any contract which creates $100,000 or more operating expenses during a term and the provisions in such contracts, the bank where the operating revenue is maintained, and the use of design rights.

Although the operating agreement provides the Sports Authority with significant involvement in the management of the Arena, the agreement also vests in Powers the authority to make binding government decisions. Pursuant to Tennessee Code Annotated section 7-67-109 the Sports Authority is statutorily authorized to (1) operate, maintain, manage, and enter into contracts for the operation, maintenance and management of the Arena; (2) fix, collect rates, rentals, fees and charges for the use of the Arena; (3) contract for the operation of concessions on or in the Arena; and (4) advertise for the Arena. However, Powers has been empowered to perform these same functions under the operating agreement. The agreement specifically provides Powers with the authority to (1) supervise the use of the Arena; (2) maintain, repair, replace, enhance and refurbish the Arena; (3) negotiate, execute, perform, and enforce contracts, use agreements, licenses and other agreements; (4) coordinate all advertising, licensing, promotional activities, marketing and public relations for the Arena; (5) establish all necessary pricing, including the price of admittance to the Arena; and (5) provide for and supervise the sale of food, beverages, souvenirs, novelties, programs and other merchandise and the operation of the concession areas.

Powers contends however that it is not performing a government function because clauses of the operating agreement disavow the existence of an agency relationship. Specifically, the operating agreement provides that "[Powers] is acting as an independent contractor and not as an agent employee, joint venturer or partner of the Sports Authority or the Metropolitan Government." Although the Tennessee Court of Appeals once found the use of an agency analysis instructive in determining whether a private entity's records should be subject to the Public Records Act, the Supreme Court rejected this analysis in *Cherokee*.

[t]he Court of Appeals also has looked to agency law when determining whether records should be open to public scrutiny. In *Creative Restaurants, Inc. v. City of Memphis,* the court addressed whether the Act would allow public inspection of certain subleases in the possession of a private, for-profit corporation which was involved in an "urban renewal" project for the City of Memphis. 795 S.W.2d 672, 673 (Tenn.Ct.App.1990). After outlining the complex contractual relationship between the corporation and the city, the court observed that "[w]hile the parties have been placed in the posture of lessor and lessee insofar as legal terminology is concerned, they are substantially in the posture of principal and agent." *Id.* at 678. This relationship, the court held, was sufficient under the circumstances of the case to establish the subleases as public records. *Id.* In the case under submission, the Court of Appeals applied an agency analysis similar to that used in *Creative Restaurants, Inc.* to conclude that Cherokee was an independent contractor and not an agent of the State. In addition, the court held, for similar reasons, that documents in the hands of a part-time city attorney were public records because the attorney was the city's agent. *Id*. at 678-79.

Our review of relevant authority, however, leads us to conclude that the law of agency is not the ideal vehicle for determining whether records in the possession of a given private entity should be subject to public scrutiny under the Act. The difficulty with the agency analysis arises because of the growing trend toward privatization of governmental functions and services.

*Cherokee*, 87 S.W.3d at 76.

The Court in *Cherokee* went on to hold that other factors relevant in the adopted functional equivalent analysis outweighed the fact that the contract disavowed any agency relationship between Cherokee and the State. 87 S.W.3d at 80.

Powers also argues that under Connecticut law, its duties under the operating agreement cannot be construed so as to make it the functional equivalent of a public agency because it does not govern or regulate. In *Domestic Violence Servs. of Greater New Haven, Inc. v. Freedom of Info. Comm'n*, 704 A.2d 827, 832 (Conn.Ct.App.1998), the court stated:

Performing a government service pursuant to contract does not make an entity a public agency subject to the act. See *Forsham v. Califano,* 587 F.2d 1128, 1138 (D.C.Cir.1978), aff'd, 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980). The key to determining whether an entity is a government agency or merely a contractor with the government "is whether the government is really involved in the core of the program." *Id.*

Courts have held that entities that are the functional equivalent of a public agency have the power to govern or to regulate or to make decisions. See

> *Washington Research Project, Inc. v. Dept. of Health, Education & Welfare,* supra,
> 504 F.2d at 248; *Board of Trustees v. Freedom of Information Commission,* supra,
> 181 Conn. at 555, 436 A.2d 266.  The plaintiff here has no power to govern, to
> regulate or to make decisions affecting government; it provides advocacy services to
> the victims of domestic violence pursuant only to its contractual obligation.

*Domestic Violence Servs. of Greater New Haven, Inc.*, 704 A.2d at 832.

However, in determining whether the organization in *Cherokee* was the functional equivalent of a government agency, the Court never referred to a requirement that an organization govern or regulate.  Furthermore, in holding that Cherokee was the functional equivalent of a government agency, it does not appear that Cherokee met such a requirement.

Like the Court in *Cherokee*, we believe the fact that: (1) the entirety of Powers' operating expenses are provided by the Sports Authority; (2) the Sports Authority is extensively involved in the management of the Arena; and, (3) Powers participates in making binding governmental decisions regarding the management of the Arena; outweigh the fact that the parties' contract disavows any agency relationship and Powers has no authority under the contract to govern or regulate.  Having found that Powers performs a governmental function in the management of the Arena for the Sports Authority, we must now consider the level of government funding which Powers receives from the Sports Authority.

## B. Government Funding

As we stated above, the operating agreement clearly provides that the Sports Authority is solely responsible for providing the funds necessary to pay the costs and expenses incurred by Powers in the performance of its management responsibilities and obligations.  However, the Sports Authority's entanglement with the financial affairs of Powers' management of the Arena are not limited to funding.

First, the operating agreement requires that Powers consult with the Sports Authority at least twice per year regarding the rates and charges for events and parking.  The Sports Authority also has the sole discretion to determine the fee charged, if any, for community events.  As part of the annual budgeting process, Powers must furnish the Sports Authority with a proposed allocation of shared employee expenses between Powers and the NHL team, together with a reasonably detailed summary explaining the basis of the allocation.  If the Sports Authority rejects the allocation, Powers is required to appoint a qualified independent individual acceptable to the Sports Authority to determine a fair and equitable allocation.  Powers is further required under the contract to collect all operating revenue and deposit it an account maintained at a bank selected by the Sports Authority.  If at the end of the year there is a balance in the account, Powers is required to first replenish any deficit in the working capital fund and then turn over any remaining amount to the Sports Authority.

However the most compelling evidence of the Sports Authority's entanglement in Powers' financial affairs pertains to budgeting and reporting. First, at the close of each operating year, Powers must furnish the Sports Authority with an aggregate and specific line-item statement of operating revenues, expenses, and income. Powers must also provide the Sports Authority with a general monthly report. Prior to the commencement of each operating year, Powers is further required to submit for the Sports Authority's review and approval a detailed line-item budget for all projected operating revenues and expenses and any proposed expenditures in excess of $100,000 for building, furniture, machinery, or equipment. The operating agreement goes on to state:

> The Sports Authority shall review all proposed budgets and amendments thereto and communicate to [Powers] any comments or revisions thereto. [Powers] shall cooperate with the Sports Authority to make revisions to the proposed budget and provide back-up information to the Sports Authority as is requested by the Sports Authority to obtain the final approval of the Sports Authority's budget. In addition, [Powers] shall assist with the presentation of the Sports Authority's budget to the Metropolitan County Council of the Metropolitan Government of Nashville and Davidson County.

Finally, the Sports Authority is vested with the "unqualified right" to obtain from Powers "at any time upon reasonable request" its financial records relating to the management, operation, and maintenance of the Arena and to audit its books and records.

Powers contends that because the funding and financial oversight with respect to the management of the Arena are conducted by the Sports Authority as opposed to the Metropolitan Government, Powers' financial affairs not controlled by the government but rather by a public non-profit corporation. The Sports Authority, while a separate corporate entity, is merely an agency or instrumentality of the Metropolitan Government of Davidson County, Tennessee. *See Fort Sanders Presbyterian Hosp. v. Health and Educ.l Facilities Bd. of the County of Knox*, 453 S.W.2d 771, 774 (Tenn.1970) ("The Health and Educational Facilities Board, while it is a separate corporate entity, is merely an agency or instrumentality of Knox County, formed under a duly adopted Resolution of Knox County."); *Garner v. Blount County*, No. E1999-02525-COA-R3-CV, 2000 WL 116026, at *3-4 (Tenn.Ct.App. Jan. 28, 2000) ("the Public Building Authority, inasmuch as it is an instrumentality of the County that it serves, is an 'agency' of Blount County"). Tennessee Code Annotated section 7-67-109 specifically provides that "Each sports authority created pursuant to this chapter shall be a public nonprofit corporation and a public instrumentality of the municipality with respect to which the authority is organized." Therefore it is inapposite that Powers' financial affairs are controlled by an agent of the Metropolitan Government as opposed to the government itself.

Powers also argues that the purpose of the Sports Authority's activities is to evaluate rather than to control Powers' daily activities. *See Domestic Violence Servs. of Greater New Haven, Inc.*, 704 A.2d at 833-34. This argument is without merit since the operating agreement does not merely allow the Sports Authority to review the annual budget and statements of operating revenue,

expenses, and expenditures but instead expressly provides the Sports Authority with the power to approve or reject the yearly operating budget prior to the commencement of each operating year.

Powers next asserts that the scope of its liability provided under the operating agreement and the unavailability of governmental tort immunity are evidence of the organization's financial independence. Powers bases its argument on a provision in the operating agreement which provides that Powers is solely liable for "any Damages arising or resulting from [Powers'] (or any of its agents', contractors', or employees') negligence, misconduct, malfeasance or violation of this Agreement which are not covered by any Manager Policy." However, it appears that Powers personal liability is limited only to its own negligence or to the negligence of its employees. The section of the operating agreement pertaining to operating expenses paid exclusively by the Sports Authority includes:

> all damages, or expenses suffered or paid by [Powers] as the result of any and all claims, demands, suits, causes of action, proceedings, judgments and liabilities, including reasonable attorneys fees incurred in litigation and otherwise (including claims related to the Intellectual Property), assessed, incurred or sustained by or against any of them including under or pursuant to contracts executed by [Powers] in accordance with the authority granted hereunder.

Furthermore, the fact that the operating agreement provides that the sovereign immunity of the Sports Authority does not apply to Powers fails to establish that Powers is not the functional equivalent of a governmental entity. In *Cherokee*, our Supreme Court held that Cherokee was the functional equivalent of a governmental entity despite the fact that the State incurred no tort liability for Cherokee's activities.

Finding that the Sports Authority exercises substantial control and authority over the financial affairs of Powers in the management of the Arena, including exclusively funding of the management and operation of the Arena, we now must weigh the extent of government involvement in the management of the Arena.

## C. Government Involvement, Regulation, or Control

The operating agreement is replete with evidence of the Sports Authority's substantial oversight of Powers' management of the Arena. The agreement expressly states that Powers:

> [A]cknowledges that the Metropolitan Government has substantial interest in all matters related to the management, operation, use and enjoyment of the Arena due, in part, to the fact that (i) the cost of constructing the Arena was borne by the Metropolitan Government, (ii) the Arena was constructed to provided [sic] benefits to the citizens of Nashville and Davidson County and the State of Tennessee, and (iii) the Metropolitan Government has provided and is likely to hereafter provide

substantial funding to the Sports Authority for the operation, management, maintenance, repair and refurbishment of the Arena.

The agreement goes on to require that the Arena be used in a manner that is consistent with the use of public facilities, stating that Powers must avoid permitting the use of the Arena "in a manner that is offensive to the standards of the community or inconsistent with the use of the Arena as a publically-owned venue." Furthermore, Powers must "promote the use of the Arena for the broad spectrum of sporting, recreational, business, cultural, educational, entertainment and social activities and events in order to maximize the benefit of, the presence of, and the availability of the Arena in and to the community." In addition, Powers agreed to "[c]omply with the commercially reasonable instructions, directives, policies and procedures of the Sports Authority."

However, Powers not only agreed to comply with the Sports Authority's overarching directives regarding the management of the Arena but it acquiesced to the Sports Authority's control over more minute managerial decisions. Under the agreement, Powers cannot contract for material alterations to the Arena in excess of $25,000 without the prior approval of the Sports Authority. When Powers purchases equipment, materials or supplies in excess of $10,000 for a single item or $50,000 for any one purchase order, Powers agreed under the contract to "utilize a competitive bidding process similar to that used by the Metropolitan Government for similar goods and services." Furthermore, because the Arena was constructed in large part with the proceeds from Metropolitan Government bonds, Powers agreed that "it is necessary that the Arena be operated in such a way that limits the amount of any private business use." Finally, upon termination of the agreement, Powers must surrender to the Sports Authority everything that was purchased with operating revenues or with funds made available by the Sports Authority and "deliver to the Sports Authority all documents, records and other work product generated by [Powers] in connection with the operation and management of the arena."

The Sports Authority's regulation over Powers' management of the Arena extends to financial oversight as well. As previously discussed, Powers must submit annual line-item budgets for the Sports Authority's review and approval. It must also maintain complete financial records which are to be made available to Sports Authority. The right of the Sports Authority to obtain Powers' books and records and to inspect and audit such records is unqualified. The agreement further reserves in the Sports Authority and Metro the right to inspect the Arena at all times in order to fulfill its "responsibility to the public to ensure that the Arena is operated and maintained in a manner consistent with public facilities."

Despite the Sports Authority's extensive regulation and control over Powers' management of the Arena, Powers argues that it is not the functional equivalent of a governmental agency because it has discretionary authority over the day-to-day operations of the Arena and because it maintains control over its employees. Powers relies on *Domestic Violence Servs. Of Greater New Haven, Inc.*, where the Connecticut court stated:

Finally, the commission argues that because the state may audit the plaintiff's budget and interview its staff and clients, that activity constitutes government regulation. This argument, too, falls short of the mark. The purpose of such government activity is to evaluate, not to control, the plaintiff's daily activity. See *United States v. Orleans*, supra, 425 U.S. at 817-18, 96 S.Ct. at 1977-78. "[A] critical element in distinguishing [an agency] from either a contractor ... or a grantee ... was the federal government's 'control [of] the detailed physical performance.'" *Forsham v. Califano,* supra, 587 F.2d at 1135. Because government does not have day-to-day involvement in the ongoing activities of the plaintiff, the third prong of the functional equivalent test is not met.

We believe that the government's involvement with Powers' management of the Arena is not merely limited to evaluating its performance, but rather constitutes pervasive governmental control. In *Domestic Violence Servs. of Greater New Haven, Inc.*, the Freedom of Information Commission argued that a domestic violence services organization was governmentally controlled because the organization's employees were required to meet state certification and confidentiality requirements. 704 A.2d at 833. In determining that the organization was not subject to government control, the court stated:

> The advocates have expertise in helping the victims of family violence and function without day-to-day control by the state or other government agencies when working with victims referred by the court. Advocates have no decision-making authority. See *id*. Therefore, the professional standards and government regulations that the advocates are required to follow do not make the plaintiff the functional equivalent of government.

*Domestic Violence Servs. of Greater New Haven, Inc.*, 704 A.2d at 833.

The court also found that the ability of the state to audit the organization's budget and interview its staff and clients alone was insufficient to constitute governmental control. *Domestic Violence Servs. of Greater New Haven, Inc.*, 704 A.2d at 834. In this case however, the Sports Authority's regulation of Powers includes not only the ability to audit the organization's budget but also the authority to approve certain contracts, to require the use of a competitive bidding process in some transactions and to approve annual budgets prior to the commencement of the operating year. Furthermore, in virtually every privatization situation the private entity contracted to perform services for the government will exercise control over its employees and some discretionary authority over day-to-day activities. The very reason for the privatization of a governmental function is to give government responsibility to a more experienced private organization, better equipped to efficiently and economically perform the function. *See Cherokee*, 87 S.W.3d at 76 ("Since the 1980s, governmental entities in various parts of the nation have looked increasingly to privatization as a possible solution to perceived problems of inefficiency or expense in the provision of public services.").

-17-

### D. Creation of the Entity

The final prong of the functional equivalency test requires us to consider the way in which the entity was formed. The parties agree that Powers was not created by the government and thus, the fourth prong of the test is not met. The Court would note however that the Tennessee Supreme Court in *Cherokee* held that a non-profit corporation may be the functional equivalent of a government agency even though the corporation is privately incorporated and the contract disavows the existence of an agency relationship. *Cherokee*, 87 S.W.3d at 80.

Balancing the factors, we believe that the trial court properly concluded that Powers acts as the functional equivalent of a government agency in the management of the Arena and as such, Powers is subject to the Public Records Act. We believe that this decision comports with the public policy expressed by our Supreme Court in *Cherokee* that the public has the "fundamental right to scrutinize the performance of public services and the expenditure of public funds." 87 S.W.3d at 78.

### V. Public Records Act Exception

Having found that Powers is subject to the constraints of the Public Records Act, we must now consider whether an exception exists to prevent the public disclosure of the settlement agreement. In devising the Public Records Act, "the General Assembly recognized from the outset that circumstances could arise where the reasons not to disclose a particular record or class of records would outweigh the policy favoring public disclosure. Accordingly, the General Assembly provided two types of exceptions from disclosure under the public records statutes." *Swift*, 159 S.W.3d at 571. First, there are specific exceptions contained in the public records statutes themselves and secondly, the General Assembly has recognized that both explicit and implicit exceptions may be found in state law. *Swift*, 159 S.W.3d at 571. Since the parties agree that the settlement agreement is not exempt under the Public Records Act, we must determine whether state law either explicitly or implicitly excepts the document.

The settlement agreement at issue in this case was created by the parties during court-ordered mediation pursuant to Tennessee Supreme Court Rule 31. Rule 31 provides, "Pursuant to the provisions of this rule, a court may order the parties to an eligible civil action to participate in certain alternative dispute resolution proceedings." As the trial court duly noted, the only provision in the Rule pertaining to confidentiality relates to the mediator's obligation to "[p]reserve and maintain the confidentiality of all information obtained during the Rule 31 ADR Proceedings." Powers asserts however that Rule 31 exempts confidential mediated settlement agreements from disclosure since the Rule's general principles recognize the importance of "privacy and confidentiality."

Powers further asserts that in *The Tennessean v. City of Lebanon*, No. M2002-02078-COA-R3-CV, 2004 WL 290705, (Tenn.Ct.App. Feb. 13, 2004), this Court endorsed the proposition that settlement agreements arising from court-ordered mediation pursuant to Rule 31 are confidential and exempt from the Public Records Act. Powers mis-characterizes the holding of the Court. In

determining whether the city rightfully refused access to a settlement agreement, the Court never reached the city's argument that Rule 31 required that the settlement agreement remain confidential. *City of Lebanon*, 2004 WL 290705, at \*7. The Court instead found the argument inapplicable because the settlement mediation between the parties did not take place in the context of a Rule 31 court order. *City of Lebanon*, 2004 WL 290795, at \*7.

As the Court noted in *Swift*, in making the determination whether state law explicitly or implicitly excepts a document the court must "be guided by the clear legislative policy favoring disclosure. Thus, unless it is clear that disclosure of a record or class of records is excepted from disclosure, we must require disclosure even in the face of a 'serious countervailing considerations.'" 159 S.W.3d at 572 (citing *Memphis Publ'g Co. v. City of Memphis*, 871 S.W.2d at 684). Rule 31 does not clearly delineate an exception to the Public Records Act and we do not have the authority to create one, therefore the settlement agreement is not excepted from disclosure under the Public Records Act.

## VI. Authority to Order Disclosure

Upon finding that the Powers was the functional equivalent of a governmental agency, the trial court ordered that "the settlement agreement ... be publically disclosed by filing the settlement agreement in the Circuit Court Clerk's Office." The court's asserted authority for its order was based on two grounds: (1) the court's discretionary power; and (2) proposed amendment to Rule 1A of the Tennessee Rules of Civil Procedure. Powers contends that the trial court went beyond the authority granted in the Public Records Act by requiring that the settlement agreement be filed with the clerk's office instead of merely providing Gannett with a copy of the document.

"There is no generally recognized state or federal constitutional right of access to public records." *Abernathy*, 838 S.W.2d at 214. Access to the settlement agreement has been conferred upon Gannett and the public by statute enacted by the General Assembly. *See Abernathy*, 838 S.W.2d at 214. Furthermore, "[t]he General Assembly has the power to create, limit, or abolish a right which is not conferred by the Constitution." *Abernathy*, 838 S.W.2d at 214. Tennessee Code Annotated section 10-7-505(e) expressly provides that "[u]pon a judgment in favor of the petitioner, the court shall order that the records be made available to *the petitioner*..." (emphasis added). We therefore find that the court was beyond its authority in requiring that the settlement agreement be filed with the clerk's office.

## VII. Attorney's Fees

Finally, Gannett challenges the trial court's denial of attorney's fees. Tennessee Code Annotated section 10-7-505(g) provides:

(g) If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining

the record, including reasonable attorneys' fees, against the nondisclosing governmental entity.

Tenn.Code Ann. § 10-7-505(g).

"Under the Act, the decision whether to award attorney's fees is left to the discretion of the trial court; consequently, we will not disturb that decision absent clear evidence of an abuse of that discretion." *Cherokee*, 87 S.W.3d at 80. The trial court stated in its memorandum decision that, "the court does not award attorney's fees to the plaintiffs at this point in the litigation. The court is of the opinion that the defendants acted reasonably and in good faith." Finding no abuse of discretion, we uphold the trial court's denial of attorney's fees.

## VIII.  Conclusion

The significant scope of the opinion of the Supreme Court in *Cherokee* is determinative of the outcome of this case. After acknowledging that "The Court of Appeals has taken a relatively narrow approach toward defining whose records should be considered subject to the Act," 87 S.W.3d at 75, the Supreme Court, relying on authorities from Connecticut, Maryland, North Carolina, Oregon, Kansas and Florida, described in detail the "functional equivalency" doctrine. In repudiating the "independent contractor" basis upon which this Court decided *Memphis Publ'g Co. v. Cherokee Children*, as well as the "legislative determination" approach in *Memphis Publ'g Co. v. Shelby County Healthcare Corp.*, 799 S.W.2d 225 (Tenn.Ct.App.1990) and the agency analysis in *Creative Restaurants, Inc. v. City of Memphis*, 795 S.W.2d 672 (Tenn.Ct.App.1990), the Supreme Court firmly established "functional equivalency" as the law of Tennessee. The fact that the term "functional equivalency" does not appear in the Tennessee Public Records Act, but rather is judicially implemented in statutory construction of that Act is immaterial. The Supreme Court held:

> Consequently, in light of our duty to construe the Tennessee Public Records Act liberally in favor of "the fullest possible public access to public records," we follow the Connecticut Supreme Court and interpret records "made or received . . . in connection with the transaction of official business by any governmental agency" to include those records in the hands of any private entity which operates as the functional equivalent of a governmental agency. In making this determination, we look to the totality of the circumstances in each given case, and no single factor will be dispositive. The cornerstone of this analysis, of course, is whether and to what extent the entity performs a governmental or public function, for we intend by our holding to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity. Beyond this consideration, additional factors relevant to the analysis include, but are not limited to, (1) the level of government funding of the entity; (2) the extent of government involvement with, regulation of, or control over the entity; and (3) whether the entity was created by an act of the legislature or previously determined by law to be open to public access.

*Cherokee*, 87 S.W.3d at 79.

> The Supreme Court further observed by footnote:

> We emphasize that our rationale is driven by our interpretation of the term "public records" in the Tennessee Public Records Act and by considerations unique to the policies furthered by the Act. Hence, our decision has no bearing upon other areas of the law involving governmental entities.

87 S.W.3d at 79.

The judgment of the trial court is affirmed in part, reversed in part and remanded for further proceedings. Costs of the cause are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE