# IN THE COURT OF APPEALS OF TENNESSEE AT JACKSON
April 25, 2017 Session

## MEMPHIS PUBLISHING COMPANY D/B/A THE COMMERCIAL APPEAL, ET AL. v. CITY OF MEMPHIS, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-16-1074-1      Walter L. Evans, Chancellor**

_____

### No. W2016-01680-COA-R3-CV
_____

This appeal arises out of an action brought by a newspaper seeking access to application materials in the possession of a nonprofit professional association that was assisting the City of Memphis in recruiting candidates for its Director of Police. The trial court concluded that the records held by the association were subject to disclosure under the Tennessee Public Records Act because the association acted as the functional equivalent of the City and because the position of police director was the same as a chief public administrative officer, a position for which the Act mandates that all employment application materials be made available. The association and the City appeal. We reverse the determination that the records are subject to disclosure; we affirm the denial of an award of attorney's fees to the newspaper.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Affirmed in Part**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

Jonathan P. Lakey, William B. Walk, Jr., and John J. Cook, Memphis, Tennessee, for the appellant, City of Memphis.

Zackery B. Busey and Lori H. Patterson, Memphis, Tennessee, for the appellant, International Association of Police Chiefs.

Lucian T. Pera and J. Bennett Fox, Jr. and, Memphis, Tennessee, for the appellee, Louis Graham and Memphis Publishing Company d/b/a The Commercial Appeal.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

In March 2016, the City of Memphis entered into an agreement ("the Agreement") with the International Association of Chiefs of Police, Inc. ("IACP") to have IACP assist with its search for the next Director of the Memphis Police Department.[1] According to the Agreement with the City, IACP was to solicit and receive application materials from candidates nationwide, perform an initial review of those resumes and cover letters, and "identify the best candidates (approximately 10-20 semifinalists) for initial screening," which would include "internet checks and structured telephone interviews." IACP would then "recommend a group (approximately six) of the most highly qualified candidates for further on-site evaluation."

In June, a reporter employed by *The Commercial Appeal* newspaper requested that the City produce copies of all applications for the Director of Police position. A city official responded that "IACP was handling the application process for the City, so we do not have them in our possession and will not be giving them out for media to review." The reporter made a similar request to IACP, noting that he was "primarily interested in the finalists, if any have been selected yet, but would like to receive all applications if not." IACP did not respond to the request. On June 23, counsel for the newspaper wrote to the City Attorney and IACP's Deputy Executive Director requesting access to the applications by the following evening, or suit would be brought pursuant to the Tennessee Public Records Act (or "TPRA").

On June 28, 2016, Memphis Publishing Company, doing business as *The Commercial Appeal*, and Louis Graham, editor of *The Commercial Appeal* (collectively, "Petitioners") filed a "Petition for Access to Public Records and to Obtain Judicial Review of Denial of Access" in Shelby County Chancery Court, pursuant to Tennessee Code Annotated section 10-7-505(b). The petition named the City and IACP as Respondents. After expedited discovery, each Respondent filed a response, with supporting affidavits, in opposition to the petition. On July 15, IACP provided the City with a list of six candidates it recommended for consideration; the City released the names to the public the same day. On July 20, the court held a hearing on the petition; on the same day, but prior to the hearing, the City released the recommended candidates'

---

[1] According to the affidavit of Kim Kohlhepp, manager of IACP's executive search service, IACP is a non-profit professional association of more than 25,000 law enforcement officers in 121 countries, including the United States; it is headquartered in Virginia. In addition to its police executive search service, the IACP advocates on behalf of law enforcement professionals by developing policy positions and priorities; offers training and technical assistance to its members; conducts and publishes research; and holds conferences to facilitate the exchange of information and best practices among law enforcement professionals.

biographies, resumes, photographs, cover letters, and, where applicable, news clippings related to the candidates.

On July 29, the court ruled that all materials were public records within the meaning of the TPRA and, consequently, ordered Respondents to immediately make available to Petitioners copies of the materials from all applicants still held by IACP. Holding that the Respondents did not act willfully in withholding the documents, the court denied Petitioners' request for attorney fees. IACP and the City appealed. In accordance with Tennessee Code Annotated section 10-7-505(e),[2] a separate order was entered certifying that substantial legal issues existed with respect to the disclosure of the documents at issue which ought to be resolved by the appellate court.

The City raises the following issues for our review:

1. Whether the trial court erred in holding that IACP was the functional equivalent of the City of Memphis and that IACP's confidential information records relating to the position of Director of Police, information and records that never have been in the possession of the City, were subject to the Tennessee Public Records Act (Tenn. Code Ann. §§10-7-503 et seq.) (herein the "Act").
2. Whether the trial court erred in holding that the term "chief public administrative officer" contained in Tenn. Code Ann. §10-7-503(f) includes the position of Director of Police for the City of Memphis.
3. Whether the trial court erred in holding that Petitioners' request for "any applications submitted for the position of Chief of Police of the City of Memphis" included more than just applications for the position of Director of Police.

IACP phrases its issues on appeal as follows:

1. Whether, under the specific circumstances of this case, the Tennessee Supreme Court's [*Memphis Publ'g Co. v.*] *Cherokee* [*Children & Family Servs, Inc.,* 87 S.W.3d 67 (Tenn. 2002)] decision was intended to and should apply to IACP?

---

[2] Tennessee Code Annotated section 10-7-505(e) reads as follows:

(e) Upon a judgment in favor of the petitioner, the court shall order that the records be made available to the petitioner unless:

(1) There is a timely filing of a notice of appeal; and
(2) The court certifies that there exists a substantial legal issue with respect to the disclosure of the documents which ought to be resolved by the appellate courts.

2. If the Tennessee Supreme Court's *Cherokee* decision applies to IACP, whether, under *Cherokee*, IACP is the functional equivalent of a government agency such that IACP's records are subject to inspection under the Tennessee Public Records Act?
3. If, under *Cherokee*, IACP's records are subject to inspection under the Tennessee Public Records Act, whether IACP's records are exempt from inspection under Section 503(d)(3) of the Act?
4. Whether IACP's records are independently subject to inspection under Section 503(f) of the Tennessee Public Records Act?

The Petitioners raise as an issue "[w]hether the Shelby County Chancery Court erred in denying Petitioners' request for attorney fees pursuant to Tenn. Code Ann. § 10-7-505(g)"?

## II. ANALYSIS

The Tennessee Public Records Act, set forth in Tennessee Code Annotated section 10-7-101 *et. seq.*, "grants access to records of government agencies throughout the state." *Gautreaux v. Internal Med. Educ. Found., Inc.*, 336 S.W.3d 526, 529 (Tenn. 2011) (citing *Cole v. Campbell,* 968 S.W.2d 274, 275 (Tenn. 1998)). The purpose of the Act "is to promote public oversight of governmental activities." *Id.* (citing *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.* 87 S.W.3d 67, 74 (Tenn. 2002)). The Tennessee Supreme Court has interpreted the legislative mandate of the TPRA "to be very broad and to require disclosure of government records[3] even when there are significant countervailing considerations." *Gautreaux,* 336 S.W.3d at 529 (citing *Memphis Pub'g Co. v. City of Memphis,* 871 S.W.2d 681, 684 (Tenn. 1994)). In *Patterson v. Convention Ctr. Auth. of Metro. Gov't of Nashville & Davidson Cty.*, this Court stated:

Notwithstanding the presumption of openness, in the interest of public policy the General Assembly has provided specific explicit exemptions from disclosure contained in the TPRA itself. It has also "acknowledged

---

[3] Government or public records are defined in Tennessee Code Annotated section 10-7-503(A)(i) as follows:

(A) "Public record or records" or "state record or records":

(i) Means all documents, papers, letters, maps, books, photographs, microfilms, electronic data processing files and output, films, sound recordings, or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any governmental entity[.]

4

and validated both explicit and implicit exceptions from disclosure found elsewhere in state law." *Swift v. Campbell,* 159 S.W.3d 565, 571 (Tenn. Ct. App. 2004). In an action filed for review of the denial of access to a record by a governmental entity, the governmental entity carries the burden of proof to justify nondisclosure by a preponderance of the evidence. *Schneider* [*v. City of Jackson*], 226 S.W.3d [332] at 339 [(Tenn. 2007)] (citing Tenn. Code Ann. § 10-7-505(c)).

421 S.W.3d 597, 606–07 (Tenn. Ct. App. 2013).

As an initial matter, we address a jurisdictional issue raised by the City.[4] In its brief, the City argues that the court did not have jurisdiction to rule on whether the resumes and cover letters submitted to IACP were public records because the Petitioners only requested "applications." This is a distinction without a difference. Exhibit A to the Agreement provides that "IACP will acknowledge receipt of application materials from candidates and conduct an initial review of all resumes and cover letters." In paragraph 19 of his affidavit, Kim Kohlhepp, manager of the IACP's executive search service, states that "[t]he only material IACP has received from each of these candidates is an email message, a cover letter and a resume"; in paragraph 24, he refers to these materials as "applications." In light of the reference in the Agreement to resumes and cover letters as "application materials" and similar language in Mr. Kohlhepp's affidavit, we find no merit to the City's argument and no error in the holding that the request for "applications" included the resumes and cover letters submitted by interested parties,[5] as that was the method for candidates to express their interest in the position.

## A. WHETHER IACP OPERATED AS THE FUNCTIONAL EQUIVALENT OF THE CITY OF MEMPHIS

The trial court held that the IACP served as the "functional equivalent" of the City of Memphis, such that all applications in its possession were public records and should be subject to the record request. IACP and the City contend that this holding was error.

---

[4] This is raised as the City's third issue.

[5] The trial court found that "although the information submitted by potential candidates was not a traditional fill in the blank application, there is no discernible difference between the information that would be included on a traditional application and the information received from applicants by IACP." The trial court stated that "[i]t is no more likely that Respondents would have provided the information requested by Petitioners if the public records request was a request for specific application materials, or more particularly, emails, resumes and cover letters." These findings are supported by the affidavits of Mr. Kohlhepp and Ms. Smith.

5

In *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.,* *("Cherokee"),* the Tennessee Supreme Court was called upon to determine "whether a non-profit corporation that provides privatized services to a governmental entity is subject to the public access requirements of the Tennessee Public Records Act." 87 S.W.3d 67, 70 (Tenn. 2002). The entity at issue in that case was an agency that provided "transitional child care services for children of low-income families referred by the Department of Human Services . . . includ[ing] the listing and classification of child care providers, referrals of qualified families to appropriate child care centers, and the monitoring and supervision of each placement under guidelines provided by DHS." *Id.* at 71. Funding was "provided by Federal and State block grants which are used for tuition payments and administrative expenses." *Id.*

In considering whether the corporation operated as the functional equivalent of the government, such that its records should be subject to the TPRA,[6] the Supreme Court articulated a test:

> When a private entity's relationship with the government is so extensive that the entity serves as the functional equivalent of a governmental agency, the accountability created by public oversight should be preserved.
>
> . . . [I]n light of our duty to construe the Tennessee Public Records Act liberally in favor of "the fullest possible public access to public records,"

---

[6] The records sought included:

> 1. All rental agreements, leases, receipts of payments and other records related to any rental agreements between Cherokee and Affordable Homes;
> 2. All receipts, invoices, contracts, and other records pertaining to any and all professional and/or consulting fees paid by Cherokee since January 1, 1995;
> 3. Records documenting any and all payments to officers and directors of Cherokee since January 1, 1997;
> 4. All records, including without limitation invoices, receipts, and expense reports, documenting expenses for travel, conferences, conventions, meetings and meals since January 1, 1995, incurred and/or paid by Cherokee, as reflected in Cherokee's annual form 990 reports filed with the Internal Revenue Service;
> 5. All invoices, receipts, and other records detailing and documenting any or all "contributions" identified or listed in Cherokee's annual form 990 reports to the Internal Revenue Service from January 1, 1995, to the present;
> 6. All canceled checks and monthly statements involving all bank accounts maintained by Cherokee from January 1, 1995, to the present;
> 7. All invoices, receipts and any other records documenting or pertaining to rents paid by Cherokee from January 1, 1995, to the present; and
> 8. All contracts, consulting agreements, leases, retainers or other binding agreements entered into by Cherokee from January 1, 1990, to the present.

*Cherokee,* 87 S.W.3d at 72.

we follow the Connecticut Supreme Court [in *Connecticut Humane Soc'y v. Freedom of Info. Comm'n,* 591 A.2d 395 (1991)] and interpret records "made or received ... in connection with the transaction of official business by any governmental agency" to include those records in the hands of any private entity which operates as the functional equivalent of a governmental agency. In making this determination, we look to the totality of the circumstances in each given case, and no single factor will be dispositive. The cornerstone of this analysis, of course, is whether and to what extent the entity performs a governmental or public function, for we intend by our holding to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity. Beyond this consideration, additional factors relevant to the analysis include, but are not limited to, (1) the level of government funding of the entity; (2) the extent of government involvement with, regulation of, or control over the entity; and (3) whether the entity was created by an act of the legislature or previously determined by law to be open to public access.

We caution that our holding clearly is not intended to allow public access to the records of every private entity which provides any specific, contracted-for services to governmental agencies. A private business does not open its records to public scrutiny merely by doing business with, or performing services on behalf of, state or municipal government. But when an entity assumes responsibility for providing public functions to such an extent that it becomes the functional equivalent of a governmental agency, the Tennessee Public Records Act guarantees that the entity is held accountable to the public for its performance of those functions.

*Id.* at 78-79 (footnotes omitted). The Court concluded that the agency was subject to the Public Records Act because it served as the functional equivalent of the government and that access to the entity's records was necessary in order preserve "the accountability created by public oversight." *Id.* at 78.

In a case in which the court is called upon to apply the functional equivalency test, the initial burden is on the petitioner to show that the private entity operates as the functional equivalent of a governmental entity. *Allen v. Day*, 213 S.W.3d 244, 251 (Tenn. Ct. App. 2006). The standard of review we apply was set forth in *Cherokee*:

Our determination whether the Tennessee Public Records Act applies to the records in [a private entity]'s possession is a question of law. We review questions of law de novo with no presumption of correctness accorded to the findings of the court below. *See Gleaves v. Checker Cab Transit Corp.,*

7

*Inc.,* 15 S.W.3d 799, 802–03 (Tenn. 2000); *Ridings v. Ralph M. Parsons Co.,* 914 S.W.2d 79, 80 (Tenn. 1996). . . .

*Cherokee*, 87 S.W.3d at 74.  As noted, the test consists of four factors, which we address *seriatim*.

## 1. Whether and to What Extent IACP performed a Governmental or Public Function

In the present case, the services IACP was to provide involved: (1) "job and candidate profiling," in which the IACP would meet with leaders in the community to learn the profile sought for the position of chief of police; (2) "recruitment, marketing and advertising," in which the IACP would develop and distribute a recruitment brochure and use its network to search for candidates meeting the profile; and (3) "applicant screening, evaluation and selection," in which the IACP would receive application materials, conduct an initial review of those materials, and categorize candidates before conducting "internet checks" and telephone interviews to compile a list of approximately six candidates.  From this point, IACP's role was to support the City in its selection by developing an interview process, scheduling and coordinating finalists' travel arrangements, developing questions and scheduling interviews, conducting background investigations, and notifying non-selected candidates.  The trial court concluded that "IACP by advertising and narrowing the candidate pool to six [applicants] performed a critical function typically performed by government."  We respectfully disagree with this determination.

This Court acknowledged in *Allen v. Day* that "[g]overnment function is not statutorily defined and Tennessee case law provides little guidance." 213 S.W.3d at 253.  Noting that the Supreme Court relied on Connecticut law in its decision to adopt the functional equivalence test in *Cherokee,* we looked to the definition of a government function in the context of Connecticut's Freedom of Information Act, which we determined to be similar to the TPRA, and which states:

> (11) "Governmental function" means the administration or management of a program of a public agency, which program has been authorized by law to be administered or managed by a person, where (A) the person receives funding from the public agency for administering or managing the program, (B) the public agency is involved in or regulates to a significant extent such person's administration or management of the program, whether or not such involvement or regulation is direct, pervasive, continuous or day-to-day, and (C) the person participates in the formulation of governmental policies or decisions in connection with the

administration or management of the program and such policies or decisions bind the public agency. "Governmental function" shall not include the mere provision of goods or services to a public agency without the delegated responsibility to administer or manage a program of a public agency.

Conn. Gen. Stat. Ann. § 1–200(11).

213 S.W.3d 244, 253–54 (Tenn. Ct. App. 2006). Applying the factors in the statute, we held that the private entity performed a governmental function in its management of the arena because "(1) the entirety of [the entity's] operating expenses are provided by the Sports Authority; (2) the Sports Authority is extensively involved in the management of the Arena; and, (3) [the entity] participates in making binding governmental decisions regarding the management of the Arena." *Allen*, 213 S.W.3d at 256.[7]

The question posed in *Allen* was also addressed in *Gautreaux*, in which payment records were requested from a tax-exempt entity that was founded "to 'provide educational programs, research and support services for the internal medicine residence program' at UTCOM [the University of Tennessee College Of Medicine — Chattanooga Unit]." *Gautreaux*, 336 S.W.3d at 528. UTCOM contracted with the private entity to record the hours during which UTCOM faculty members supervised residents at a Chattanooga hospital and to pay UTCOM faculty members for their teaching services. *Id*. The Supreme Court addressed the contractual relationship between the private entity and the governmental agency that provided medical education and determined that the private entity was not involved in "the extensive performance of a governmental function contemplated by *Cherokee* or described in *Friedmann*." *Gautreaux*, 336 S.W.3d at 530. The Court noted that the agency "did not delegate the responsibility to manage or administer [the] teaching program," nor did the private entity "control whom [the agency] employed as a faculty member or the manner in which the faculty taught or supervised . . . students." *Id.* The Court concluded that the private entity's "performance of the functions of [the government agency] was not extensive and that the first *Cherokee* factor weigh[ed] in favor of holding that IMEF is not the functional equivalent of a government

---

[7] Since *Allen* was decided, some cases in which the functional equivalence test was involved did not question whether the action performed by the private entity was in fact a governmental function. In *Friedmann v. Corrections Corp. of America*, this Court held that it was "at a loss as to how operating state prison could be considered anything less than a governmental function." 310 S.W.3d 366, 375 (Tenn. Ct. App. 2009). Similarly, in *City Press Commc'ns, LLC v. Tennessee Secondary Sch. Athletic Ass'n*, this Court concluded that "it is undeniable that education is a government function, and [Tenn. Comp. R. & Regs. 0520-01-02-.08(1)] made it clear that the Tennessee State Board of Education viewed the supervision and regulation of athletic activities in public junior and senior high schools of Tennessee as one of its governmental functions." 447 S.W.3d 230, 238 (Tenn. Ct. App. 2014).

agency." *Id.* Ultimately, after examining all four *Cherokee* factors, the Court held that the entity did not serve as the functional equivalent of a governmental entity. *Id.* at 531.

Applying these precedents to the record before us, we have determined that the services performed by IACP in identifying potential candidates for the position of Director of the Memphis Police Department does not equate to performing a governmental function. The governmental function here is the hiring of the director of police, and this function was never delegated or assigned to the IACP. Our conclusion is guided by the affidavit of Alexandria Smith, Chief of Human Resources for the City, which states, "[T]he City is not obligated to choose its Police Director from the list produced by IACP." Ms. Smith's statement makes it clear that IACP's list of candidates was not binding on the City. The City did not control how IACP performed the services specified in the Agreement. IACP provided a service to the City, and we do not construe the essentially administrative tasks of conducting a preliminary search and delivering a non-binding list of recommended candidates to be the same as managing a program of the City or otherwise making a decision that would bind the City. Rather, the services IACP performed were incidental to the selection of the director—a task wholly assumed by the City. Accordingly, we conclude that IACP did not perform a governmental function and that this factor does not weigh in favor of a finding that IACP operated as the functional equivalent of the City.

## 2. The Level of Government Funding of the Entity

According to Kim Kohlhepp's affidavit, "less than one percent of IACP's annual revenue is derived from its executive search service." In this regard, the Agreement shows that the City was to pay IACP $40,000 for its services. The revenue that IACP received for its services related to the search for the Memphis Police Director is a miniscule part of its overall budget and does not constitute a substantial level of governmental funding of IACP. *See Cherokee*, 87 S.W.3d at 79 (observing that this factor weighed in favor of finding that the entity served as a functional equivalent of the government, where "over ninety-nine percent of [the corporation's] funding came from governmental sources"). Accordingly, we conclude that this factor does not weigh in favor of a finding that IACP served as the functional equivalent of the City.

## 3. The Extent of Government Involvement with, Regulation of, or Control over the Entity

Ms. Smith's affidavit states, "The City does not control in any way the manner in which IACP performs its services." Other than the Agreement, there is no evidence of any other contract between the City and the IACP, and there is nothing to demonstrate that the City has regulated or exercised control over IACP in its provision of services or otherwise. The services IACP provides are limited to the three areas identified in the Agreement and the performance of those services necessitates little if any City

involvement with or control over IACP. Further, the City has not delegated any of its official responsibilities or authority to IACP, as the City was not bound to hire its director of police from the list of candidates recommended by IACP. Accordingly, we conclude that this factor does not weigh in favor of a finding that IACP operated as the functional equivalent of the City.

### 4. Whether the Entity Was Created by an Act of the Legislature or Previously Determined by Law to be Open to Public Access

IACP is a non-profit corporation organized and headquartered in Virginia. It was not created by the Tennessee Legislature, and the affidavit of Kim Kohlhepp states, "Never before, in any jurisdiction, have records relating to IACP's executive search functions been determined by any court to constitute 'public records.'" Accordingly, we conclude that this factor does not weigh in favor of a finding that IACP served as the functional equivalent of the City.

Having considered all of the relevant factors, we conclude that in performing the services specified in the Agreement, IACP was not operating as the functional equivalent of the City of Memphis. *See Gautreaux*, 336 S.W.3d at 531 (holding that "merely providing services for, or doing business with, a government agency does not render a private entity the functional equivalent of a government agency") (citing *Cherokee*, 87 S.W.3d at 79).

### B. WHETHER TENNESSEE CODE ANNOTATED SECTION 10-7-503(F) COMPELS DISCLOSURE OF THE DOCUMENTS STILL HELD BY IACP

The trial court also concluded that the position of director of police fit the definition of "any chief public administrative officer" and the materials in IACP's possession were thereby subject to disclosure pursuant to Tennessee Code Annotated section 10-7-503(f).[8] IACP and the City argue that the holding was error because the statute does not apply to the position of director of police. Petitioners rely on *Bd. of Ed. of Memphis City Sch. v. Memphis Pub. Co.*, 585 S.W.2d 629 (Tenn. Ct. App. 1979), and a 2016 Opinion of the Tennessee Attorney General, Tenn. Op. Atty. Gen. No 16-16 (May

---

[8] Tennessee Code Annotated section 10-7-503(f) provides:

> (f) All records, employment applications, credentials and similar documents obtained by any person in conjunction with an employment search for a director of schools or any chief public administrative officer shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law. For the purposes of this subsection (f), the term "person" includes a natural person, corporation, firm, company, association or any other business entity.

11

4, 2016), in contending that the court correctly held that disclosure of the materials was required under section 503(f).

"The construction of a statute and its application to the facts of a case are questions of law, which we review de novo with no presumption of correctness." *Gautreaux,* 336 S.W.3d at 531 (citing *Larsen–Ball v. Ball,* 301 S.W.3d 228, 232 (Tenn. 2010)). Upon our consideration of section 10-7-503(f), the legislative history, and in the context of other provisions of the TPRA, we do not construe the term "chief public administrative officer" to include the position of chief of police or police director. In reaching this conclusion, we apply the well-known standard:

> Our role in construing statutes is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *State v. Sliger,* 846 S.W.2d 262, 263 (Tenn. 1993). We must determine the legislative intent, whenever possible, from the plain language of the statute, "read in the context of the entire statute, without any forced or subtle construction which would extend or limit its meaning." *National Gas Distribs. v. State,* 804 S.W.2d 66, 67 (Tenn. 1991). Moreover, statutes "in pari materia"—those relating to the same subject or having a common purpose—are to be construed together, and the construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute. *Belle–Aire Village, Inc. v. Ghorley,* 574 S.W.2d 723, 725 (Tenn.1978); *Spence v. Miles Laboratories, Inc.,* 810 F.Supp. 952 (E.D.Tenn.1992). Finally, the Legislature is presumed to have knowledge of its prior enactments and to know the state of the law at the time it passes legislation. *Neff v. Cherokee Ins. Co.,* 704 S.W.2d 1, 4 (Tenn.1986).

*Wilson v. Johnson Cty.*, 879 S.W.2d 807, 809–10 (Tenn. 1994).

The term "chief public administrative officer" is not defined in the TPRA, and subsection 503(f) is the only place in the Tennessee Code where the phrase is used. In the *Board of Education* case upon which Petitioners rely in urging that the term should be construed to include a director of police, this Court was considering whether Tennessee Code Annotated section 15-304 gave the press the right to review the applications for school superintendent which were held by a screening committee of private citizens. 585 S.W.2d at 630. At that time, section 15-304 read as follows:

> All state, county, and municipal records shall at all times, during business hours, be open for personal inspection by any citizen of Tennessee, and those in charge of such records shall not refuse such right of inspection to any such citizen, unless otherwise provided by law or regulations made pursuant thereto.

Interpreting the statute, the court held "that the personnel files in the hands of the Search Committee of applicants for the position of Superintendent are public records within the meaning of portions of Title 15 of our Code . . ., and therefore, portions of Title 15 apply thereto." *Id.* at 630. Section 15-304 was subsequently renumbered and codified as section 10-7-503; the statute has been amended over the years, with subsection (f) added in 2005. 2005 Tenn. Pub. Acts, c. 263, § 1, eff. May 28, 2005. The Attorney General's Opinion likewise addressed the question of whether records obtained by a third party in conjunction with the search for a director of schools were public records and subject to inspection under section 10-7-503(f); the Attorney General determined that they were. Inasmuch as the statute, as presently worded, specifically requires application materials for the position of director of schools to be accessible, neither authority significantly aids in our analysis.

To resolve whether the term "chief public administrative officer" was intended to include the position of director of police for the City of Memphis, we look first to section 504, where the Legislature identified exceptions from the disclosure requirements of the TPRA and designated certain records confidential. One of the positions specifically identified therein is the "chief law enforcement officer." Tenn. Code Ann. § 10-7-504(g). Further informing our consideration is the statement of Senator Fowler, sponsor of the amendment that added section 503(f), on May 10, 2005, before the Senate State and Local Government Committee, which indicates that the 2005 amendments are to apply to searches for director of schools or a position, such as city manager, that would "run the city":

> There is an amendment being distributed to try to address some questions that were raised last week about the use of term association of public officials or something such thing. And concerns whether that related to the county commissioner's association and the Tennessee school board association itself. To make clear that it deals with employment searches for directors of schools or any chief public administrative officer. For example, we have some cities that might have, and in fact we have going on now, searches for a city manager who really would run the city. In one city it's an open process and another city it's not an open process.

Upon our consideration of the statutory scheme and legislative history, we are not persuaded that the position of director of police was intended to be included within the ambit of section 503(f); if the Legislature had so intended, it could have used the specific language designating the position "chief law enforcement officer" as it did in section 504.[9] Tennessee Code Annotated section 10-7-503(f) does not apply to the applications for the director of police position at issue in this appeal.

---

[9] In its response to the petition, the City of Memphis indicated that Memphis has a Chief Administrative Officer, who "coordinates under the supervision of the mayor the activities of all administrative

13

## C. WHETHER TENNESSEE CODE ANNOTATED SECTION 10-7-503(D)(3) EXEMPTS IACP FROM THE REQUIREMENTS OF THE TPRA

IACP asserts that its records are exempt from disclosure due to "[s]ection 503(d)(3) of the TPRA provid[ing] an exemption for nonprofits organized as a [26 U.S.C.A.] 501(c)(3) and making available to the public IRS Form 990."[10] IACP contends that it fits both of those requirements.

It does not appear that this statute was raised as a defense by IACP in the trial court and did not form a basis for the trial court's decision. In *In re Taylor B.W.*, the Supreme Court observed that "[i]t has long been the rule that this Court will not address questions not raised in the trial court." 397 S.W.3d 105, 114 (Tenn. 2013) (citing *Lawrence v. Stanford,* 655 S.W.2d 927, 929 (Tenn. 1983); Tenn. R. App. P. 36(a)). This issue was not raised in the court below and is unnecessary to our resolution of this appeal. We therefore decline to address this issue.

In summary, we conclude that the application materials held by IACP are not records subject to disclosure under the TPRA.

---

divisions." The position is appointed by the mayor, with the approval of the City Council, and may be dismissed by the mayor without the Council's approval. It is apparent that, in Memphis, this position is the "chief public administrative officer" contemplated in section 503(f).

[10] Tennessee Code Annotated section 10-7-503(d) is lengthy and has been summarized as follows in *Gautreaux*:

> In addition to providing that government records are available for public inspection, the Public Records Act also provides that the records of certain nonprofit entities are available to the public. Tenn. Code Ann. § 10–7–503(d). . . . Tennessee Code Annotated section 10-7-503(d)(1) provides that the "records of any association or nonprofit corporation described in § 8-44-102(b)(1)(E)(i) shall be open for inspection." Tenn.Code Ann. § 10-7-503(d)(1). . . . The statute, however, provides several exceptions to the requirement that the records of a nonprofit corporation must be open.

336 S.W.3d at 531 (footnote omitted). The Court further explained in a footnote:

> In addition, the statute contains two other exceptions. Tennessee Code Annotated Section 10-7-503(d)(1) [now (d)(2)] provides that the organization is exempt from subsection (d) if it meets an audit exception. *Tennessee Code Annotated section 10-7-503(d)(2)* [now (d)(3)] *provides that an organization is exempt if it is a tax exempt entity under the provisions of 26 U.S.C. § 501(c)(3) and it makes its Form 990 public after redacting certain information pursuant to Internal Revenue Services regulations."*

*Id*. at 531 n.4 (emphasis added).

14

**D. ATTORNEY'S FEES**

As a final matter, the Petitioners assert that the court erred in not assessing attorney's fees and costs against IACP and the City because the entities "knew these records were public yet willfully refused to disclose them."[11]  In light of our holding that the records in IACP's possession are not subject to disclosure under the TPRA, the Petitioners are not entitled to an award of attorney's fees.  Accordingly, we affirm the judgment of the trial court declining to award attorney's fees. *See Morrison v. Allen*, 338 S.W.3d 417, 449 n.7 (Tenn. 2011) (noting that a lower court's judgment may be affirmed when it "reaches the correct result even if it is based on different, incomplete, or erroneous grounds" and citing *Cont'l Cas. Co. v. Smith,* 720 S.W.2d 48, 50 (Tenn. 1986); *Hopkins v. Hopkins,* 572 S.W.2d 639, 641 (Tenn. 1978); *Martin v. Senators, Inc.,* 418 S.W.2d 660, 665 (Tenn. 1967)).

**III. CONCLUSION**

We conclude that the judgment of the trial court that materials held by IACP are subject to disclosure should be reversed; we affirm the court's decision to not award attorney's fees.  The case is dismissed.

RICHARD H. DINKINS, JUDGE

---

[11] Tennessee Code Annotated section 10-7-505(g) reads, in pertinent part:

> If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and willfully refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining the record, including reasonable attorneys' fees, against the nondisclosing governmental entity.  . . .

15