IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 18, 2017 Session

## OLIVER WOOD ET AL. V. JEFFERSON COUNTY ECONOMIC DEVELOPMENT OVERSIGHT COMMITTEE, INC.

Appeal from the Chancery Court for Jefferson County
No. 13-CV-212     Don R. Ash, Senior Judge[1]

_____

No. E2016-01452-COA-R3-CV

_____

In 2009 and 2010, the legislative bodies of Jefferson County, Jefferson City, and Dandridge enacted resolutions requesting that the Jefferson County Chamber of Commerce create a non-profit corporation to be called the Jefferson County Economic Development Oversight Committee (EDOC).  Its purpose was to promote economic development in the county.  In 2013, a group of citizens filed this action seeking a declaration that EDOC is subject to the provisions of the Tennessee Public Records Act, Tenn. Code Ann. § 10-7-503 (2012), and the Open Meetings Act, Tenn. Code Ann. § 8-44-101 *et seq.* (2016).  After a bench trial, the court denied the plaintiffs' requested relief.  They appealed.  We find and hold that the undisputed facts establish that EDOC performs a governmental function, recieves a substantial amount of taxpayer funding, and is significantly involved with and regulated by the governing city and county legislative bodies.  In light of our duty to broadly construe and interpret the Public Records and Open Meetings Acts in favor of governmental transparency and accountability, we hold that the EDOC is subject to these acts.  The judgment of the trial court is reversed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J.,W.S., joined.

D. Scott Hurley and Ryan N. Shamblin, Knoxville, Tennessee, for appellants, John Gunn, Clarice Gunn, Jack Kenley, Charlotte Kenley, Steve Monroe, Carol Monroe, Charles Crosby, Steve Hammer, Bandi Hammer, Leroy Malone, Annette Loy, and Peggy Corbett.

_____

[1] Sitting by interchange.

James L. Gass and Anna C. Penland, Sevierville, Tennessee, for appellee, Jefferson County Economic Development Oversight Committee, Inc.

## Opinion

### I.

On July 21, 2009, the Jefferson County Commission enacted "a resolution requesting and approving the creation of a non-profit corporation to be known as the Jefferson County Economic Development Oversight Committee, Inc." The resolution provides, in pertinent part, as follows:

> WHEREAS, through an extensive community planning process, Jefferson County, Tennessee (the "County"), along with other participants in the community, developed a strategic action plan (the "Strategic Plan") to promote economic development in the County; and
>
> WHEREAS, the balanced growth of the economy in the County will help stabilize the tax base in the County and promote job opportunities for the citizens of the County; and
>
> WHEREAS, *a primary governmental purpose of the County is to promote economic development for the benefit of its citizens*; and
>
> WHEREAS, the County desires that a non-profit corporation be formed in order to coordinate the implementation of the Strategic Plan; and
>
> WHEREAS, the County intends to provide significant funding for such non-profit corporation;
>
> NOW, THEREFORE, BE IT RESOLVED by the Board of Commissioners of the County (the "Governing Body"), as follows:
>
> Section 1. <u>Formation of Corporation</u>. The County hereby requests that the Jefferson County Chamber of Commerce

2

facilitate the creation of a non-profit corporation to be known as the Jefferson County Economic Development Oversight Committee, Inc. (the "Corporation"). The purpose of the Corporation shall be to promote economic development within the County and to oversee the utilization of public and private resources to implement the Strategic Plan.

Section 2. <u>Representation on the Board of Directors</u>. The Chairman of the County Commission, The County Mayor and the Finance Director of the County shall be directors of the Corporation with their service as such directors to coincide with the terms of office of such persons.

Section 3. <u>Additional Authorizations</u>. All additional acts and doings of the County Mayor and County Clerk of the County and any other representative or officer of the County which are in conformity with the purposes and intent of this Resolution shall be and the same hereby are in all respects, approved and confirmed.

(Italics added; underlining in original). On December 8, 2009, the Town of Dandridge's Board of Mayor and Aldermen enacted a functionally identical resolution. On January 4, 2010, the Jefferson City Council followed suit, enacting its own, nearly identically-worded, resolution.

The EDOC was incorporated as a non-profit "public benefit corporation" on July 26, 2010. Its charter states that EDOC's purpose is "promoting economic development and alleviating unemployment in Jefferson County, Tennessee and other charitable purposes within the meaning of §§ 501(c)(3) and 170(c)" of the Internal Revenue Code. EDOC's application to the IRS for tax-exempt status under section 501(c)(3) states, in pertinent part, as follows:

The Jefferson County [EDOC] is the outgrowth of a comprehensive strategic planning initiative in Jefferson County, Tennessee to coordinate economic development activities among the governmental entities in the County and to plan and implement a new economic future for the County.

\* \* \*

3

[EDOC's] primary purpose is *to serve as the entity that will centralize the economic development activities of Jefferson County, the City of Jefferson City and Town of Dandridge in order to undertake those activities in the most efficient manner so that public funds are efficiently utilized* while leveraging private support. The Chair of the County Commission and the Finance Director of Jefferson County are members of the Board of Directors of [EDOC], and the Mayors of the City of Jefferson City and the Town of Dandridge also serve on the Board of Directors. Therefore, public officials make up half of the members of the Board of Directors of [EDOC]. The bylaws of [EDOC] provide that these public officials serve ex officio on the Board of Directors of [EDOC]. The governing bodies of Jefferson County, the City of Jefferson City and the Town of Dandridge each adopted resolutions acknowledging that economic development is a primary governmental purpose and requesting the formation of [EDOC] in order to promote economic development on their behalves. . . . It is expected that the governmental entities referenced above will provide approximately 60% of the funding for [EDOC] to undertake its activities.

The specific activities that [EDOC] will undertake in order to fulfill its economic development mission on behalf of the County are several. First, [EDOC] will coordinate business recruitment efforts on behalf of the County. . . . Second, [EDOC] will provide support for existing local companies through counseling and technical assistance. Third, [EDOC] will make efforts to improve the retail climate in the County so that the County will be an attractive location for retail establishments. . . . Finally, [EDOC] will seek to enhance recognition of the County as a tourist destination.

*     *     *

[EDOC's] purpose is not to provide services to specific members. In fact, [EDOC] will have no members. Rather, [EDOC's] mission is *to coordinate the strategic economic development efforts of the entire County, including the public entities therein*.

\*     \*     \*

> [EDOC's] charitable mission is therefore at least twofold. First, it is lessening the burdens of government *by undertaking the economic development activities on behalf of Jefferson County, the City of Jefferson City and the Town of Dandridge*. This type of *coordinated governmental effort* is precisely what is needed is this time of limited resources, and through such coordination, [EDOC] is substantially lessening the burdens of government. Secondly, [EDOC] is promoting the social welfare of the community by reducing poverty through job growth and combating community deterioration by addressing the decline in the County's tax base.

(Emphasis added.)

Plaintiffs filed their complaint on October 24, 2013. Following discovery and the trial court's grant of partial summary judgment to EDOC, which plaintiffs have not appealed, a trial was conducted on May 24 and 25, 2016. Several public officials testified: Darrell Helton, CEO of the Chamber of Commerce and former Jefferson City Mayor and Jefferson County Finance Director; David Seal, County Commissioner; George Gantte, Mayor of Dandridge; Marty Mills, former County Commission Chairman; and Mark Potts, Mayor of Jefferson City. Several plaintiffs also testified, as did Jay Moser, a member of the EDOC Board of Directors since its inception. The trial court ruled that "the EDOC: (1) is not a 'public body' so as to qualify as a 'governing body' subject to the Open Meetings Act and (2) is not the functional equivalent of a government agency subject to the Public Records Act." Plaintiffs timely filed a notice of appeal.

## II.

The issues presented are as quoted from plaintiffs' brief:

> 1. Whether the trial court erred in determining that EDOC is not the functional equivalent of a government agency subject to the Public Records Act.

> 2. Whether the trial court erred in determining that EDOC is not a "public body" subject to the Open Meetings Act.

5

The facts pertinent to this appeal are generally not in dispute.  The interpretation and application of the Public Records Act and the Open Meetings Act involve questions of law, which we review de novo with no presumption of correctness.  ***Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.***, 87 S.W.3d 67, 79 (Tenn. 2002).

**IV.**

**A.**

The Tennessee Public Records Act provides that "[a]ll state, county and municipal records shall, at all times during business hours . . . be open for personal inspection by any citizen of this state, and those in charge of the records shall not refuse such right of inspection to any citizen, unless otherwise provided by state law."  Tenn. Code Ann. § 10-7-503(a)(2)(A).  The Act further states that "[a]ny citizen of Tennessee who shall request the right of personal inspection of any state, county or municipal record as provided in § 10-7-503, and whose request has been in whole or in part denied . . . shall be entitled to petition for access to any such record and to obtain judicial review of the actions taken to deny the access."  Tenn. Code Ann. § 10-7-505(a).

In the seminal ***Memphis Publ'g Co.*** case, the Supreme Court thoroughly analyzed the Act and observed as follows:

> The Tennessee Public Records Act "governs the right of access to records of government agencies in this state."  ***Cole v. Campbell***, 968 S.W.2d 274, 275 (Tenn. 1998).  Through its provisions, the Act serves a crucial role in promoting accountability in government through public oversight of governmental activities.
>
> \*     \*     \*
>
> The General Assembly has declared that the Act "shall be broadly construed so as to give the fullest possible public access to public records."  Tenn. Code Ann. § 10–7–505(d) (1999).  "Our . . . cases reflect the broad construction of 'record' under the Act and a consistent adherence to the policy of full public access."  ***Tennessean v. Electric Power Bd.***, 979 S.W.2d 297, 301 (Tenn. 1998).  Accordingly, we . . . interpret the terms of the Act liberally to enforce the public

interest in open access to the records of state, county, and municipal governmental entities.

87 S.W.3d at 74. Addressing the issue of "whether [a] private entity's records should be subject to public access," *id.* at 78, the High Court stated as follows:

> [P]rivate entities that perform public services on behalf of a government often do so as independent contractors. Nonetheless, the public's fundamental right to scrutinize the performance of public services and the expenditure of public funds should not be subverted by government or by private entity merely because public duties have been delegated to an independent contractor. When a private entity's relationship with the government is so extensive that the entity serves as the functional equivalent of a governmental agency, the accountability created by public oversight should be preserved.
>
> Consequently, in light of our duty to construe the Tennessee Public Records Act liberally in favor of "the fullest possible public access to public records," we follow the Connecticut Supreme Court and interpret records "made or received . . . in connection with the transaction of official business by any governmental agency" to include those records in the hands of any private entity which operates as the functional equivalent of a governmental agency. In making this determination, we look to the totality of the circumstances in each given case, and no single factor will be dispositive. The cornerstone of this analysis, of course, is whether and to what extent the entity performs a governmental or public function, for we intend by our holding to ensure that a governmental agency cannot, intentionally or unintentionally, avoid its disclosure obligations under the Act by contractually delegating its responsibilities to a private entity. Beyond this consideration, additional factors relevant to the analysis include, but are not limited to, (1) the level of government funding of the entity; (2) the extent of government involvement with, regulation of, or control over the entity; and (3) whether the entity was created by an act of the legislature or previously determined by law to be open to public access.

7

*Id.* at 78-79 (footnotes omitted); *see also* **City Press Commc'ns, LLC v. Tenn. Secondary Sch. Athletic Ass'n**, 447 S.W.3d 230, 235, 240 (Tenn. Ct. App. 2014) (holding "the TSSAA serves as the functional equivalent of a governmental agency, the Tennessee State Board of Education, by directing and managing the extracurricular sporting activities of almost every high school in the state"); **Gautreaux v. Internal Med. Educ. Foundation, Inc.**, 336 S.W.3d 526, 529 (Tenn. 2011) (holding a non-profit internal medicine education corporation was not the functional equivalent of a governmental agency where its duties were "merely ministerial" and it "merely acted as a bookkeeper" for a state university); **Friedmann v. Corr. Corp. of Am.**, 310 S.W.3d 366, 375 (Tenn. Ct. App. 2009) (Corrections Corporation of America is the functional equivalent of a state agency because it provided prison services that the state is required to provide); **Allen v. Day**, 213 S.W.3d 244, 246 (Tenn. Ct. App. 2006) (privately held LLC that provided management services to run day-to-day operations of the Gaylord Entertainment Center is the functional equivalent of a governmental agency).

Our initial inquiry is "whether and to what extent [EDOC] performs a governmental or public function." **Memphis Publ'g Co.**, 87 S.W.3d at 79. The resolutions passed by Jefferson County, Jefferson City, and Dandridge each state that "a *primary governmental purpose* of the County [or Municipality] is to promote economic development for the benefit of its citizens." (Emphasis added.) EDOC was incorporated at the request of these respective legislative bodies and tasked with that very "primary governmental purpose." The testimony of various witnesses at trial confirmed that EDOC has been the primary agency promoting economic development on behalf of Jefferson County and its municipalities since its incorporation. Moreover, both former Mayor Helton and Mayor Potts testified that they agreed that the promotion of economic development is a primary governmental purpose. No one testified that it was not a governmental function. Both EDOC's bylaws and its statement of purpose in the IRS application state that its economic development activities are undertaken "*on behalf of*" the county and municipal governments. We find that EDOC performs a governmental or public function, and that this factor weighs in favor of a finding that EDOC is subject to the Public Records Act as the functional equivalent of a governmental agency.

Regarding the level of public funding, the governments of Jefferson County, Jefferson City, and the municipalities of Dandridge, White Pine, and Baneberry have voted each year to provide funding to EDOC amounting to between 60.1% and 67.6% of its budget. In 2012, EDOC received public funding of $276,156, which was 67.6% of its total budget of $412,844. In 2013, its public funding was $279,156, 62.8% of the total; in 2014, it was $275,653 (60.1%); in 2015, it was $283,653 (60.9%). Commissioner Seal testified at trial in May 2016 that the county commission had recently voted to allocate $299,999.99 to EDOC. Thus, over a quarter of a million dollars in public funds per year

8

has been allocated to EDOC.  Generally speaking, the expenditure of taxpayer revenues in these amounts can fairly be said to be a governmental function.

The remainder of EDOC's budget is comprised of contributions from private individuals and business entities.  Former Mayor Helton, who stated that he was serving as the "chief operating officer" of EDOC at the time of trial, testified that these contributors were referred to as "investors."  Helton and others testified that traditionally, four seats on EDOC's Board of Directors were held by representatives of the four largest investors, *i.e.*, those four contributors giving the most money to EDOC.  The other four members of the Board of Directors are public officials, as provided by EDOC's bylaws:

> The initial Board of Directors shall consist of eight (8) Directors . . .  The persons serving in the following capacities from time to time shall be <u>ex officio</u>, voting Directors of the Company: the Chair of the County Commission of Jefferson County, the Finance Director of Jefferson County (or such other County officer or employee designated by County Commission), the Mayor of the Town of Dandridge and the Mayor of the City of Jefferson City.

(Underlining in original.)  There is no procedure to break a 4-4 voting deadlock, so the four public officers voting together can block a proposed action by EDOC.  We find that there is a substantial amount of government involvement with the operations of the EDOC.

Regarding the level of governmental control or influence over the EDOC's activities, Commissioner Seal testified as follows:

> Each month EDOC and chamber of commerce send representatives to our work sessions and to our voting meetings.  They make presentations to us.  They explain to us what they're planning to do with the funding that we give them.
>
> *             *             *
>
> By the structure of their organization, our county commission chairman serves on their board, our finance director serves on their board, two of our city mayors serve on their board.  As far as interaction between the county commission and EDOC, that's every month at every meeting.  They have a

9

representative there. They field questions. They make recommendations. They answer our questions. There's monthly interaction.

* * *

Q. When they make such a recommendation and the county makes a determination to fund it, how does that happen? Does the commission vote on it or how does that logistically happen?

A. A majority of budget committee has to hear that recommendation from EDOC or chamber or any other nonprofit or any other county department, take a vote on it in budget committee after a motion is made to provide that funding. Assuming that it passes in budget committee, then it moves up to the floor of county commission for the entire body to consider as a recommendation from the budget committee.

* * *

In my service on the budget committee during this budget cycle, I proposed that EDOC and chamber of commerce both provide a written business plan and a return on investment as a condition of their funding, and that passed for the '15/16 budget cycle. That is in existence until June 30th I believe when our fiscal year ends.[2]

(Footnote added.) As an additional level of governmental oversight, no check written by or on behalf of EDOC is valid unless it bears two signatures, one of which is that of the county finance director. Helton also testified that in 2015, the county commission directed EDOC "to change the organizational structure or organizational flow chart of EDOC," which it did.

EDOC argues that it cannot be held to be performing a governmental function under this Court's analysis in *Allen*, 213 S.W.3d at 253-54, wherein we stated as follows:

---

[2]Commissioner Seal testified that the county commission did not impose the requirement on EDOC to provide a written business plan and return on investment analysis for fiscal year 2016/2017, and that he was "very much opposed to" that decision.

10

In 2001, the Connecticut legislature expressly defined "governmental function" as applied to Connecticut's Freedom of Information Act, an Act substantively similar to Tennessee's Public Records Act. The statute provides:

> (11) "Governmental function" means the administration or management of a program of a public agency, which program has been authorized by law to be administered or managed by a person, where (A) the person receives funding from the public agency for administering or managing the program, (B) the public agency is involved in or regulates to a significant extent such person's administration or management of the program, whether or not such involvement or regulation is direct, pervasive, continuous or day-to-day, and (C) the person participates in the formulation of governmental policies or decisions in connection with the administration or management of the program *and such policies or decisions bind the public agency*. "Governmental function" shall not include the mere provision of goods or services to a public agency without the delegated responsibility to administer or manage a program of a public agency.

Conn. Gen. Stat. Ann. § 1–200(11).

(Emphasis added.) EDOC points out that it undisputedly cannot make policies or decisions that bind a public agency. It routinely makes recommendations to the county commission, which is free to accept, modify, or reject them. EDOC also makes binding decisions with regard to how to spend the public money allocated to it each year, an amount averaging $278,654.50 for the years reported. While we do not disagree with the *Allen* decision, we reject EDOC's proposed interpretation that *Allen* imposed a new *requirement* that an entity must be able to make binding decisions in order to be held to be performing a governmental function. First, *Allen* quoted a Connecticut statute, which it noted was similar to the Public Records Act, but obviously is not the law in Tennessee. Second, the *Allen* Court stated that it was "[*a*]*pplying the factors* that the Connecticut legislature found relevant" in concluding "that Powers performs a governmental function

11

in its management of the Arena." 213 S.W.3d at 254 (emphasis added). This statement indicates that whether an entity participates in the formulation of policies or decisions that bind a public agency is a factor to be considered along with "the totality of the circumstances in each given case, and no single factor will be dispositive." *Memphis Publ'g Co.*, 87 S.W.3d at 79. This interpretation comports with the Supreme Court's formulation of the test in *Memphis Publ'g Co.* Third, both the Supreme Court and this Court have returned to the question of what constitutes a "governmental function" since *Allen* was decided, and neither Court referred to that opinion as establishing a requirement that an entity must make binding decisions in order to be held the functional equivalent of a governmental agency. *See Gautreaux*, 336 S.W.3d 526; *City Press Commc'ns,* 447 S.W.3d 230; *Friedmann*, 310 S.W.3d 366. Fourth, *Allen* rejected the argument of the privately held LLC in that case that it could not be "the functional equivalent of a public agency because it does not govern or regulate," stating that the Supreme Court "never referred to a requirement that an organization govern or regulate." 213 S.W.3d at 256.

The fourth relevant factor identified by the Supreme Court is "whether the entity was created by an act of the legislature or previously determined by law to be open to public access." *Memphis Publ'g Co.*, 87 S.W.3d at 79. The plaintiffs argue that EDOC was created by the county and municipal legislative bodies here, citing a dictionary definition of "create" as "to produce or bring about by a course of action or behavior." *Webster's New Collegiate Dictionary* (8th ed. 1977). While we see some logic in this semantical argument, technically what the legislatures did, as stated in their resolutions, was to "request[] that the Jefferson County Chamber of Commerce facilitate the creation of" EDOC. We cannot say that the County Commission, Jefferson City Council, or Dandridge Board of Mayor and Aldermen, which officially speak and act through their resolutions, "created" the EDOC through the resolutions enacted in this case.

EDOC itself has not been previously determined by law to be open to public access. However, our inquiry on this factor is informed by Tenn. Code Ann. § 6-58-114 (2015), which provides, in pertinent part, as follows:

> (b) There shall be established in each county a joint economic and community development board, which shall be established by interlocal agreement pursuant to § 5-1-113. The purpose of the board is to foster communication relative to economic and community development between and among governmental entities, industry, and private citizens.
>
> (c) Each joint economic and community development board shall be composed of representatives of county and city

governments, private citizens, and present industries and businesses. The final makeup of the board shall . . . at a minimum, include the county mayor and the city mayor or city manager, if appropriate, of each city lying within the county and one (1) person who owns land qualifying for classification and valuation under title 67, chapter 5, part 10; . . .

\* \* \*

(f) The board shall meet, at a minimum, four (4) times annually, and the executive committee of the board shall meet at least four (4) times annually. . . . Minutes of all meetings of the board and the executive committee shall be documented by minutes kept and by certification of attendance. *Meetings of the joint economic and community development board and its executive committee are subject to the open meetings law.*

(g)(1) The activities of the board shall be jointly funded by the participating governments. . . .

\* \* \*

(3) The board may accept and expend donations, grants and payments from persons and entities other than the participating governments. The board is authorized to transfer or to donate funds from participating governments or outside sources to other public or nonprofit entities within the county to be used for economic or industrial development purposes.

\* \* \*

(i) When applying for any state grant a city or a county shall certify its compliance with the requirements of this section.

(Emphasis added.) As can be seen, the Tennessee legislature required each county to establish a joint economic and community development board as a condition of receiving a state grant of funds. Although it cannot escape notice that EDOC bears many similarities to such a mandated board, it is not the "joint economic and community development board" created by Jefferson County to comply with the statute. That is a

13

separate body, referred to as the "1101 Board" or the "monthly mayors' meeting" by all the testifying witnesses. Helton, who was on the 1101 Board during his ten years as Jefferson City Mayor, testified:

> Well, the 1101 Board does not deal directly with recruiting particularly particular businesses into the area. They're primarily kind of an oversight board. They meet and, of course, they have reports. In other words, I would on part of the chamber would go to their monthly meetings and give them the report that I give to county commission. Just give them information, but they did not act on any economic growth or development. They were more of an informational type board.

In his deposition, Helton further explained that the 1101 Board "can actually have a budget and kind of rule on some things like that [economic development projects], but they don't." He said that "they really don't have any authority" and "I don't ever remember us taking any really official action."

The 1101 Board is, however, subject to the Open Meetings Act by the express terms of the statute. Tenn. Code Ann. § 6-58-114(f). Regarding the application of the Public Records Act to such a board, the Tennessee Attorney General has opined that:

> with the L[oudon] C[ounty] E[conomic] D[evelopment] A[gency]'s certification as a joint economic and community development board pursuant to Tenn. Code Ann. § 6-58-114, it is likely to be found to be performing a governmental or public function as defined by the Court of Appeals in *Allen v. Day*. Furthermore, the LCEDA receives the majority of its funding from governmental entities and it is governed by a board of directors which includes officials of those same governmental entities. Accordingly, based upon the definition of "governmental function" and the factors outlined in the *Memphis Publishing Co.* case, we think that the LCEDA would be held to be the functional equivalent of a government agency and, therefore, its records would be subject to inspection under the Public Records Act.

Tenn. Op. Att'y Gen. No. 07-170, 2007 WL 4800789 (Dec. 21, 2007). Although EDOC is not subject to the Public Records and Open Meetings Acts under Tenn. Code Ann. § 6-58-114, the statute supports a pair of pertinent conclusions: that economic development is

14

generally considered a proper governmental function, and that the Tennessee legislature has determined a joint economic and community development board to be subject to the transparency and accountability provided by the Open Meetings Act.

At trial, the primary example of how EDOC interacted with government to promote economic development programs was presented by testimony regarding EDOC's efforts to develop a large commercial and industrial park in Dandridge, referred to by all the witnesses as the "megasite" development. The plan involved governmental acquisition of about 1,860 acres of privately-owned farmland for the industrial megasite. Helton testified that "the decision to go forward with the planning and the recommendation of the megasite was one of the largest economic decisions potentially ever made for Jefferson County." The other public officials in their testimony generally agreed with this assessment. EDOC recommended that the Jefferson County Commission authorize funds to be used for the certification process of the megasite. These costs included the hiring of several firms: McCallum-Sweeney, a consultant with ties to the automotive industry; Blanchard & Calhoun, a real estate acquisition firm; and Moxley Carmichael, a public relations firm. Former Mayor and EDOC executive Helton testified as follows regarding the public relations efforts to persuade county commission to support the proposed development:

> Q. Moxley Carmichael, the public relations firm, did they – what role, if any, did they play in attempting to make recommendations or persuade county commission to take actions related to the Megasite?
>
> A. Well, they're a public relations firm and the reason they were hired was to help the EDOC board promote or how to do it from a public relations standpoint. That's why they were hired.
>
> Q. And did they use public relations efforts to attempt to persuade county commission?
>
> A. Well, they recommended to the EDOC board what they should do, yes.
>
> Q. Did Moxley Carmichael write comments for public officials and recommend that those comments be made at public meetings?
>
> A. They assisted in writing them, yes.

15

Garrett Wagley was the director of economic development for Jefferson County. He was employed by the Jefferson County Chamber of Commerce, but EDOC reimbursed the chamber for one hundred percent of Wagley's salary. Mayor Gantte testified as follows regarding an email he received from Wagley shortly before the commission voted to proceed with the megasite development:

> Q: [H]e was writing an email here to you, Don Cason, who was president of the chamber and kind of the chief operating officer of EDOC; is that correct?
>
> A: That is correct.
>
> Q: Also to Alan Carmichael, who is a PR representative from Moxley Carmichael out of Knoxville?
>
> A: Correct.
>
>     *     *     *
>
> Q: [The email] references a list of action items that come out of the call. And the first of those is under your name, Mayor Gantte, and there's a bullet point that says there will be and I quote, "Contact the EDOC board and encourage each member to bring at least five people to the February 11 commission meeting in support of the Megasite." Do you see that?
>
> A: That's what it says.
>
> Q: And then at the next bullet point "at the same time encourage the members to contact county commissioners to answer questions and insure that each commissioner has a firm idea of where we are in the process." I believe you specifically mentioned Commissioner Maples as a target to follow up with?
>
> A: That's what it says.
>
> Q: Now, here, Mayor Gantte, what we had was an organized effort through Mr. Wagley, the economic director, yourself,

16

the PR folks, and Mr. Cason to contact the commissioners prior to their February 11 meeting to encourage their support?

A:  That was what the email said from Mr. Wagley.

At that time, both Cason and Mayor Gantte were members of EDOC's Board of Directors.

EDOC also hired the firm of Younger Associates to prepare an economic impact analysis of the proposed megasite development, as attested by Helton as follows:

Q. Before county commission voted in February 2013 to provide funding for the Megasite, was there an economic impact analysis that was put together at the request of the Jefferson County EDOC?

A. Yes.

Q. Can you tell the Court who it was that EDOC hired to put together that report?

A. Younger and Associates.

*     *     *

Q. The purpose of this economic impact analysis was to provide some information to EDOC about the prospects of the Megasite?

A. Yes.

Q. And was this economic impact analysis used at least to some extent by EDOC in attempting to make the case for the Megasite that it was recommending?

A.  Yes.

Q. To county commission?

A. Yes.

17

Q. In fact, this economic impact analysis was discussed at county commission meetings, was it not?

A. I – I think so, yes.

Q. And we see from the face page of this document that it was put together apparently – at least it's dated on the face page January of 2013?

A. Correct.

Q. That would be the month before county commission voted, correct?

A. I think that's correct. I don't have the dates in front of me, but I believe that's right.

The analysis, which was distributed in January of 2013, states:

**Public Investment**

Jefferson County plans to invest an estimated $60 million to secure privately held land for the park and for infrastructure and site development. Additional public fund[s] provided by TVA and the State of Tennessee bring the total investment to $306.6 million.

(Bold font in original.) At the time the analysis was released, the county commission had not voted to allocate any money for the megasite development project. The public, including the landowners whose property would be impacted by the proposed development, was informed of the proposal in January of 2013. Mayor Gantte testified that "EDOC, by the time it got to that announcement [to the landowners] in January of 2013 and its request for funding in February '13, had already decided those things and was making specific recommendations to county commission."

The megasite development proposal came before the county commission on February 11, 2013. Based upon EDOC's recommendation, the commission voted to allocate $442,311 for the initial phases of certification of the megasite. Plaintiff Steve Hammer, who was present at the commission meeting, testified that "[t]here was no discussion. It was dictated. . . I saw a vote that passed with no questions, no discussion." The commission also voted not to exercise the power of eminent domain to acquire any

18

of the land for the development. At its April 15, 2015 meeting, the county commission voted to rescind the funding for the megasite, a decision made again upon EDOC's recommendation.

EDOC, in support of its argument that it is not the functional equivalent of a public agency, cites the following provision of its charter:

> No Legislative or Political Activity. No substantial part of the activities of the Corporation shall be for the carrying on of propaganda or otherwise attempting to influence legislation; and the Corporation shall not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

(Underlining in original.) The testimony of various public officials, quoted and discussed above, establishes that EDOC played a significant role in promoting the megasite development, which was described as one of the most important economic decisions ever made by the county, and which involved a large expenditure of public funds. Bearing in mind "our duty to construe the Tennessee Public Records Act liberally in favor of the fullest possible public access to public records," *Memphis Publ'g Co.*, 87 S.W.3d at 79 (internal quotation marks omitted), we hold that EDOC is the functional equivalent of a governmental agency subject to the Public Records Act.

**B.**

The Open Meetings Act, also known as the Sunshine Law, provides that "[a]ll meetings of any governing body are declared to be public meetings open to the public at all times, except as provided by the Constitution of Tennessee." Tenn. Code Ann. § 8-44-102(a). The principles applicable to our interpretation and application of the Act have been stated by this Court as follows, in pertinent part:

> Tennessee's Sunshine Law prevents government bodies from conducting the public's business in secret. *See* Tenn. Code Ann. § 8–44–101(a).
>
> The Sunshine Law is remedial. *Dorrier v. Dark*, 537 S.W.2d 888, 891 (Tenn. 1976). It should, therefore, be construed broadly to promote openness and accountability in government, and to protect the public against closed door meetings at every stage of a government body's deliberations.

*Metro. Air Research Testing Auth., Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 842 S.W.2d 611, 616 (Tenn. Ct. App. 1992) (internal citations omitted). As we observed in *Metro. Air Research*,

> Public knowledge of the manner in which governmental decisions are made is an essential part of the democratic process. The public
>
> > must be able to "go beyond and behind" the decisions reached and be appraised of the "pros and cons" involved if they are to make sound judgments on questions of policy and to select their representatives intelligently.

*Id.*; *accord* **Souder v. Health Partners, Inc.**, 997 S.W.2d 140, 145 (Tenn. Ct. App. 1998). The Sunshine Law applies to any "governing body," which is defined as follows:

> (b)(1) "Governing body" means:
>
> (A) The members of any public body which consists of two (2) or more members, with the authority to make decisions for or recommendations to a public body on policy or administration . . .
>
> \*   \*   \*
>
> (E)(i) The board of directors of any association or nonprofit corporation authorized by the laws of Tennessee that:
>
> (a) Was established for the benefit of local government officials or counties, cities, towns or other local governments or as a municipal bond financing pool;
>
> (b) Receives dues, service fees or any other income from local government officials or such local governments that constitute at least thirty percent (30%) of its total annual income; and

(c) Was authorized as of January 1, 1998, under state law to obtain coverage for its employees in the Tennessee consolidated retirement system.

Tenn. Code Ann. § 8-44-102. EDOC does not fall within section 102(b)(1)(E)(i) because it technically does not have any employees, although it reimburses the chamber of commerce for one hundred percent of the salaries of two of the chamber's employees, and additionally for an undisclosed fraction of the salaries of several others. Consequently, the issue at trial was whether EDOC is a "public body" under section 102(b)(1)(A).

The Supreme Court, in **Dorrier**, observed that the statute does not define "public body" and provided the following guidance:

> We cannot say that "public body" as used in the context of this Act, without definition, is so uncertain that men of common intelligence must necessarily guess as to its meaning and differ as to its application.
>
> It is clear that for the purpose of this Act, the Legislature intended to include any board, commission, committee, agency, authority or any other body, by whatever name, whose origin and authority may be traced to State, City or County legislative action and whose members have authority to make decisions or recommendations on policy or administration affecting the conduct of the business of the people in the governmental sector.

537 S.W.2d at 892.

We are of the opinion that EDOC's origin and authority may be traced to county and city legislative action. The resolutions "requested" and "approved" the creation of EDOC, and stated that the county and municipalities "desired that a non-profit corporation be formed," for which they "intend[] to provide significant funding." If the creation of EDOC was privately-driven, as it argues, it is unclear why all three legislative bodies voted on and approved written resolutions that were clearly designed to effectuate its creation. EDOC argues that the chamber of commerce could have refused to comply with the resolutions, a postulation that may be correct in theory, but highly unlikely in reality.

As for the second prong of the inquiry, the proof in the record is abundantly clear that EDOC's "members have authority to make decisions or recommendations on policy or administration affecting the conduct of the business of the people in the governmental sector." *Id.* at 892. Several of the public officials testified that EDOC made recommendations to county commission on a regular basis. None of these recommendations were binding, but they do not have to be in order for EDOC to be a public body for purposes of the Sunshine Law. The Supreme Court specified that the test is whether "the members have authority to make decisions *or* recommendations." (Emphasis added.) Much of what we have said in Section IV(A) on the Public Records Act is also pertinent to this Open Meetings Act analysis. The above-discussed example of the interaction between EDOC and county commission regarding the megasite development plan illustrates that EDOC has had a significant role in not only expending substantial public funds, but also in making decisions and recommendations of enormous economic importance to the people of Jefferson County. In light of our duty to construe the Open Meetings Act "broadly to promote openness and accountability in government," *Metro. Air Research*, 842 S.W.2d at 616, we hold that it applies to EDOC.

## V.

The judgment of the trial court is reversed, and this case is remanded to the trial court for such further proceedings as may be necessary, consistent with this opinion. Costs on appeal are assessed to the Appellee, Jefferson County Economic Development Oversight Committee.

_____
CHARLES D. SUSANO, JR., JUDGE

22